In re Richard Alan BROWN, Debtor.

Bankruptcy No. 94–10670.

United States Bankruptcy Court,
M.D. Louisiana.

Dec. 15, 1995.

As Amended Jan. 31, 1996.

Samera L. Abide, Chapter 7 Trustee, Baton Rouge, LA.

Randy P. Zinna, Baton Rouge, LA, for debtor.

## RULING

LOUIS M. PHILLIPS, Bankruptcy Judge.

Now before the court is the Objection of the Chapter 7 Trustee to the Claim of Exemption of the debtor, Richard Alan Brown (the "Debtor"), in certain firearms, owned and kept for personal and sporting purposes, pursuant to La.R.S. 13:3881(A)(4)(c).

The Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and 157(a). Pursuant to 28 U.S.C. § 157(b)(2)(A), this is a proceeding over which the Court has authority to issue a final order.

The Court denies the Debtor's claim of exemption because the firearms are not covered by the "arms and military accoutrements," exemption found at La.R.S. 13:3881(A)(4)(c). The Court finds that "arms and military accoutrements" refers *not* to firearms used for personal purposes, such as hunting, but instead refers to arms and military regalia used as weapons for fighting purposes, in the context of military duty.[1]

### Findings of Fact

On June 17, 1994, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code. On his Schedule C, also filed on June 17, 1994, the Debtor claimed that various firearms were exempt under La.R.S. 13:3881(A)(4)(c). Specifically, the Debtor claimed the exemption of a Walter PPKS, a Ruger Security 6, a 9MM pistol, a 12 gauge shotgun, and a 7MM Mauser Rifle (collectively, the "Firearms").

The Trustee filed a timely objection to the Debtor's claim of exemption of the Firearms, asserting that the Firearms "are not covered in La.R.S. 13:3881." The Court took the matter under advisement for purposes of trying to figure out the answer and, if such could be accomplished, to so advise the parties to this proceeding and the other trustees within this district.

### Conclusions of Law

A. *Applicability of Louisiana Exemption Law.*

■ The filing of a bankruptcy case creates an estate which is composed of all of the debtor's property, as defined in § 541 of the Bankruptcy Code, including "all legal or equitable interests of the debtor in property as of the commencement of the case."[2] Section 522 of the Bankruptcy Code, however, permits a debtor to exempt property from the bankruptcy estate by claiming certain exemptions authorized by that section.

Section 522 provides the debtor with a choice between two exemption schemes. Under § 522(b),[3] the debtor may choose the

---

1. The Court is not certain how exemption of firearms for personal use has been treated within this district or elsewhere within Louisiana by Chapter 7 trustees, and points out that in its recollection, this is the first objection to such an exemption claim brought on for hearing before this Court. Though clearly not of earth-tremoring importance, this issue, for all our research can tell us, is faced as one of first impression for a Louisiana court, state or federal.

2. *See* 11 U.S.C. § 541(a)(1) (1995).

3. Section 522(b) provides in pertinent part:

    (b) Notwithstanding section 541 of this title [Title 11], an individual debtor may exempt from property of the estate the property listed in either paragraph (1) or, in the alternative, paragraph (2) of this section.... Such property is—

    (1) property that is specified under subsection (d) of this section, unless the State law that is applicable to the debtor under paragraph (2)(A) of this subsection specifically does not so authorize; or, in the alternative,

federal exemptions set forth in subsection (d), unless the state law that is applicable to the debtor specifically does not so authorize. Alternatively, the debtor may choose under § 522(b)(2)(A) the exemptions to which the debtor is entitled under other federal law and state or local law which is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place.

■ A state, however, may "opt out" of the federal exemptions available to the debtor under § 522(d) and limit the debtor's right to claim the federal exemptions as an alternative to those provided under state law. Pursuant to § 522(b)(2)(A), Louisiana has chosen to "opt out" of the federal exemptions established by the Code in § 522,[4] and Louisiana debtors, such as the Debtor in this case, are limited to choosing exemptions available under Louisiana state law only.

The Debtor has claimed the exemption of the Firearms under La.R.S. 3881(A)(4)(c), which provides as follows:

> The following income or property of a debtor is exempt from seizure under any writ, mandate, or process whatsoever:
>
>    \*    \*    \*    \*    \*    \*

His arms and military accoutrements.

La.R.S. 13:3881 (1995).

■ The Debtor has claimed that his weapons comprising his cache are "arms," within the meaning of section 13:3881(A)(4)(c). The Trustee asserts that the guns do not fall within this category because the Debtor does not need or use them for military purposes, but instead has used and wishes to continue to use them for solely personal purposes, such as hunting, target shooting, *etc.*

### B.  *Louisiana Rules of Statutory Construction.*

Justice Cardozo once described statutory construction as "so often ... a choice between uncertainties."[5]  Whether this Court is confronted with a similar choice between "uncertainties" depends upon the amenability of La.R.S. 13:3881(A)(4)(c) to statutory interpretation, as set forth in the Louisiana Civil Code.

Article 1 of the Louisiana Civil Code, reminding the Court of the primacy of legislation, provides that the "sources of law are legislation and custom,"[6] and Article 2 pronounces that "[l]egislation is a solemn expression of legislative will."[7]  Therefore, the task before the Court is to determine the "legislative will" underlying section 13:3881(A)(4)(c).

Article 9 of the Louisiana Civil Code instructs the Court as follows:

### Art. 9.  Clear and unambiguous law

> When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.

---

(2)(A) any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place.

    \*    \*    \*    \*    \*    \*

  11 U.S.C. § 522(b)(2)(A).

**4.**  *See* La.R.S. 13:3881(B)(1), which provides:

In cases instituted under the provisions of Title 11 of the United States Code, entitled 'Bankruptcy', there shall be exempt from the property of the estate of an individual debtor only that property and income which is exempt under the laws of the state of Louisiana and under federal laws other than Subsection (d) of Section 522 of said Title 11 of the United States Code.

La.R.S. 13:3881(B)(1) (West Supp.1995).

**5.**  *Burnet v. Guggenheim*, 288 U.S. 280, 288, 53 S.Ct. 369, 372, 77 L.Ed. 748 (1933).

**6.**  La.Civ.Code art. 1 (1995).

**7.**  La.Civ.Code art. 2 (1995).

La.Civ.Code art. 9 (1995).[8]

Moreover, with regard to the meaning of words, Article 11 of the Louisiana Civil Code provides as follows:

### Art. 11. Meaning of words

The words of a law must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the law involves a technical matter.

La.Civ.Code art. 11 (1995).

Acknowledging the possibility of linguistic frailty inherent in the legislative process, the Civil Code allows for the situation where the Louisiana legislature is other than unambiguous in its solemn pronouncements.

Article 10 of the Civil Code reads as follows:

### Art. 10. Language susceptible of different meanings

When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law.

Article 12 of the Civil Code reads as follows:

### Art. 12. Ambiguous words

When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.

Finally, abiding by its faith in the notion that the law is to be read as an organic whole, the Civil Code provides in Article 13 as follows:

### Art. 13. Laws on the same subject matter

Laws on the same subject matter must be interpreted in reference to each other.

The charge to this Court is clear and unambiguous; to determine whether, in light of its generally prevailing meaning, the term "arms," when found in the phrase "arms and military accoutrements," is clear and unambiguous and, if so, to espouse its generally prevailing meaning. If not clear and unambiguous, resort is necessary to the other interpretative tools and methods afforded under Louisiana law to assist the Court in divining the intent underlying this expression of legislative will.

### C. The Plain Meaning of "Arms and Military Accoutrements."

In examining the plain meaning of "arms and military accoutrements," the Court first notes that the phrase "arms *and* military accoutrements" is conjunctive, suggesting that the terms "arms" and "military accoutrements" must be interpreted in the context of one another, rather than disjunctively. Black's Law Dictionary defines "and" as follows:

A conjunction connecting words and phrases expressing the idea that the latter is to be added to or taken along with the first. Added to; together with; joined with; as well as; including....

It expresses a general relation or connection, a participation or accompaniment in sequence, having no inherent meaning standing alone but deriving force from what comes before or after. In its conjunctive sense the word is used to conjoin words, clauses, or sentences, expressing the relation of addition or connection, and signifying that something is to follow in

8. This version of the Code provision emanates from an earlier and more pointedly colorful directive, found primarily in Article 13 of the Civil Code of 1870: "When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit." Also, on the primacy of the "plain meaning rule" within the ambit of federal statutory construction, see generally, U.S. v. American Trucking Associations, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345, 1350–51 (1940); Sutton v. United States, 819 F.2d 1289, 1292 (5th Cir.1987); Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975). On the plain meaning rule with regard to Bankruptcy Code interpretation, see Patterson v. Shumate, 504 U.S. 753, 757–60, 112 S.Ct. 2242, 2246–47, 119 L.Ed.2d 519 (1992); Taylor v. Freeland & Kronz, 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); Union Bank v. Wolas, 502 U.S. 151, 154–60, 112 S.Ct. 527, 529–33, 116 L.Ed.2d 514 (1991).

addition to that which proceeds and its use implies that the connected elements must be grammatically coordinate, as where the elements preceding and succeeding the use of the words refer to the same subject matter. While it is said that there is no exact synonym of the word in English, it has been defined to mean 'along with', 'also', 'and also', 'as well as', 'besides', 'together with'....

Black's Law Dictionary 79 (5th ed. 1979).

Taking note from one of the dictionaries of choice of the United States Supreme Court,[9] this Court notes that the definition of "and" in the Webster's Ninth New Collegiate Dictionary reads as follows:

and ... (1) used as a function word to indicate connection or addition esp. of items within the same class or type; used to join sentence elements of the same grammatical rank or function.

Webster's Ninth New Collegiate Dictionary 84 (1983).

In contrast to the word "and," which requires that the words preceding and succeeding it be construed together to yield one composite meaning, the word "or" is disjunctive and expresses an *alternative*, rather than a *synonym*. Black's Law Dictionary defines "or" as follows:

A disjunctive particle used to express an alternative or to give a choice of one among two or more things. It is also used to clarify what has already been said, and in such cases, means 'in other words,' 'to-wit,' or 'that is to say.' The word 'or' is to be used as a function word to indicate an alternative between different or unlike things.... In some usages, the word 'or' creates a multiple rather than an alternative obligation; where necessary in interpreting an instrument, 'or' may be construed to mean 'and'.

Black's Law Dictionary 987 (5th ed. 1979).

Again, to Webster's Ninth New Collegiate Dictionary:

or ... (1) used as a function word to indicate an alternative (coffee or tea) (sink or swim), the equivalent or substantive character of two words or phrases (lessen or abate) or approximation or uncertainty (five or six days).

Webster's Ninth New Collegiate Dictionary 829 (1983).

■ So, the term "arms" and the term "military accoutrements" are to be read within the context of their conjunctive joination. Before conjunction, however, what do the respective terms mean? Again, back to Webster's Ninth New Collegiate Dictionary for a definition of "arms":

[A] means (as a weapon) of offense or defense; *esp.*: FIREARM.

Webster's Ninth New Collegiate Dictionary 103 (1983).

Similarly, Webster's Third New International Dictionary defines "arm" as follows:

[A] means of offense or defense: WEAPON ...; esp. FIREARM.

Webster's Third New International Dictionary 118 (1986).

The Compact Oxford English Dictionary[10] defines "arm" as follows:

Defensive and offensive outfit for war, things used in fighting.... Defensive covering or appendages for the body; armour, mail.... Instruments of offence used in war: weapons. *fire-arms:* those for which gunpowder is used, such as guns and pistols, as opposed to *swords, spears,* or *bows. small-arms:* those not requiring carriages, as opposed to *artillery, stand of arms:* a complete set for one soldier.... A particular species of weapon.... The practice or profession of arms, service as a soldier, the military profession.

Compact Oxford English Dictionary 634 (2d ed. 1991).

Finally, Black's Law Dictionary defines "arms" as follows:

Anything that a man wears for his defense, or takes in his hands as a weapon. See also **Bear arms.**

---

**9.** *Pioneer Inv. Services v. Brunswick Associates,* 507 U.S. 380, 113 S.Ct. 1489, 1494–95, 123 L.Ed.2d 74 (1993).

**10.** This dictionary has print so compact that a magnifying glass is needed to read it.

Black's Law Dictionary 100 (5th ed. 1979).[11]

As noted, the exemption statute refers to "arms" conjointly with "military accoutrements." According to Webster's Ninth New Collegiate Dictionary 50 (1983), the term "accoutrements" means (skipping the archaic usage of the word as a verb, meaning "the act of accoutring") "an accessory item of clothing or equipment ... equipment, trappings; *specif*: a soldier's outfit usu. not including clothes and weapons." According to Webster's Third New International Dictionary 13 (1986), the term "accoutrement" means "outfit, furnishings, equipment, trappings, regalia; ... a soldier's outfit (as a rifle belt, pack and other accessories) usually not including clothes and weapons." Further refining the context of "accoutrements" as used within the exemption statute is the modifying adjective "military," which, according to Webster's Ninth New Collegiate Dictionary 1753 (1983) means "(a) of or relating to soldiers, arms, or war ... (b) of or relating to armed forces ..."[12]

The term "arms," therefore, should be construed in the context of *that which is other than* the military outfit, furnishings, equipment, trappings, regalia, *etc.* of war. Given the meaning of "military accoutrements," it is clear that the conjunctive addition of "arms" is designed to round out the entirety of a soldier's outfitting, for use within a military context. In other words, the general term "arms," which can be seen as applicable in the broad sense of, say, all firearms, must be interpreted by resort to the more particularized context established by the following "and military accoutrements." *See State v. Texas Co.*, 205 La. 417, 17 So.2d 569 (1944) (in the interpretation of a statute, words of general import are limited by words of restricted meaning which immediately follow them and relate to the same subject); *State v. Fontenot*, 112 La. 628, 36 So. 630 (1904) (where specific and general terms of the same nature are employed in a statute, whether the latter precede or follow the former, the general terms take their meaning from the specific, and are presumed to embrace only things or persons designated by them).

■ Resort, therefore, to the plain meaning analysis directs this Court's conclusion that firearms not used for military purposes are not exempt; or, to say it another way, only arms used for military purposes are covered by the exemption provision of La. R.S. 13:3881(A)(4)(c). The final leg of this linguistic analysis is the question of whether this interpretation renders absurd consequences. The Court thinks not.

It is difficult for this Court to fathom how granting the Debtor's exemption of firearms owned for personal or sporting uses would ensure his "fresh start" and ensure that his family, if he has one, will not become a burden to society. In fact, ownership of arms for hunting purposes, in this day and time, begets hunting clothes, hunting licenses, hunting vehicles, hunting outings, *etc.*, *etc.*, all of which, it is thought, involve expenditures of money that could hardly be classified as necessary. The Debtor's firearms used for personal purposes are not like wages or other essentials, without which the Debtor and his family could not live (personal protection arguments, notwithstanding). Therefore, the Court concludes that its interpretation of "arms and military accoutrements," within the meaning of section 13:3881(A)(4)(c), does not eviscerate the purpose of the exemption, but rather, in fact, furthers its purpose.

Additionally, the Court points out that limitation of "arms" to those necessary for use within a military context furthers the purposes of the fresh start in another manner. As will be fleshed out below, in an attempt to utilize other modes of statutory construction *to support* this plain meaning analysis, it

---

**11.** Black's Law Dictionary defines "bear arms" as follows:

> The Second Amendment, U.S. Constitution, provides that the 'right of the people to bear arms, shall not be infringed.' This right has been restricted however by state and federal laws regulating the transportation, sale, use and possession of weapons.

Black's Law Dictionary 140 (5th ed. 1979).

**12.** Though the definition of "accoutrements" points on all fronts to a military context, one supposes that "accoutrements" standing alone could include, for example, a Shriner's tassels, badges, *etc.*

makes perfect sense to protect military arms from seizure by general creditors.

From 1834 through the present, the Louisiana legislature has provided for the existence and equipage of a militia, thus evidencing the importance to Louisiana of maintaining its militia. In connection therewith, the Court notes that exempting arms and military accoutrements for *military* purposes, rather than for solely personal purposes such as hunting, furthers the purpose of La.R.S. 13:3881 in providing the debtor with a "fresh start" in two ways. First, by permitting the exemption of arms and military accoutrements for *military* purposes, the state ensures that creditors cannot deprive the individual debtor from fulfilling his or her duty to the state through militia service. Second, from a public policy perspective, the state militia will not be weakened by the seizure of arms necessary to its function.

Moreover, the negative consequence of allowing the seizure of arms and military accoutrements, rather than merely arms used for personal purposes such as hunting, is one of two alternatives. First, in order to fulfill his or her military duty, the debtor must purchase new arms and military accoutrements, which would interfere with his or her fresh start. Second, if the debtor cannot purchase new arms and military accoutrements, then the state must do so.[13]

As of this stopping place, the Court has performed its task under the Louisiana Civil Code: to ferret out the plain meaning of a statute from the words themselves, if possible. However, as has been noted, it is thought that this interpretation of this exemption provision is advanced as one of first impression. Therefore, perhaps for no more important reason than to calm its own jittery nerves (facing an opinion without a net), the

Court will resort to the other modes of statutory construction, provided for by the Louisiana Civil Code in support of its "plain meaning" analysis. Positing for argument purposes only (of course) that the term "arms" is susceptible of more than one meaning or is ambiguous, analysis of the purpose of the exemption statute and the context of the word "arms" in relation to the text of the law as a whole and even other laws on the same subject matter (expanding this prism to include the Constitution of the United States and the Louisiana Constitution, and exemption laws from other states) is offered.

D. *Legislative History of La.R.S. 13:3881(A)(4)(c).*

This Court has traced the legislative history of the "arms and military accoutrements" provision in search of evidence indicative of the intent or motive underlying the codification of the provision—in vain.

Louisiana's exemption of "arms and military accoutrements" can be traced back to 1825,[14] in which Chapter 6, Section 3 of the *Projet* of the Louisiana Code of Practice of 1825 provided that "The sheriff cannot seize the ... arms and military accoutrements [of the debtor]." Section 644 of the successive Codes of Practice from 1825 through 1870 also provided an exemption in identical language, suggesting that the Louisiana legislature did not wish to amend the provision in any manner. Similarly, Article 2705 of the Louisiana Civil Code of 1870 provided that, with regard to the lessor's privilege, the lessor had a right of pledge on the moveable effects of the lessee which were found on the property leased, but that "the lessee shall be entitled to retain, out of the property subjected by law to the lessor's privilege, ... his arms [and] military accoutrements."[15]

---

13. As will be shown, numerous states have utilized similar forms of exemption statutes, one must surmise, for the same reasons.

14. Actually, Louisiana exemption law may be traced back further than 1825, to French and Spanish law, including, perhaps, the *Curia Philipica* (1753, 1778) but, given language barriers, the Court has not engaged in this endeavor. The Court, however, has examined the Louisiana Senate Journal, which was available as far back as 1878, and the Louisiana House Journal, which was available as far back as 1881.

15. The 1976–1994 revisions of the Louisiana Civil Code did not retain Article 2705 of the Louisiana Civil Code of 1870.

The first and second paragraphs of Article 2705 were originally adopted as Article 2675 of the Louisiana Civil Code of 1825, which provided:

The lessor has, for the payment of his rent, and other obligations of the lease, a right of pledge on the moveable effects of the lessee, which are found on the property leased.

In 1960, the Louisiana legislature replaced Article 644 of the Code of Practice of 1870 with La.R.S. 13:3881, and retained the exemption for the debtor's "arms and military accoutrements" in section 13:3881(A)(4)(c). The legislature, however, did not amend the provision regarding "arms and military accoutrements," which reads exactly as it did in the *Projet* of the Code of Practice of 1825. Despite a series of amendments of section 13:3881 from 1961 through 1990, the exemption for "arms and military accoutrements" has never been revised.

The fact that the exemption for a debtor's "arms and military accoutrements" has never been revised, from its initial inclusion in the *Projet* of the Code of Practice of 1825, through the successive Codes of Practice and ultimately La.R.S. 13:3881, leads to the inescapable conclusion, if this Court's research is correct, that there is nothing contained within the legislative history of the provision which could provide a launching pad for a foray into an interpretation of the meaning of the words different from that determined above.

### E. The Purpose of the Exemption Laws; the Context in Which the Words Occur in the Text of the Statute.

#### 1. The Purpose

What about the purpose of the exemption statutes, as a whole? Louisiana courts have expressed a tension between their understanding of the purpose of the exemption laws (which carries with it something of a relaxed statutory-construction perspective), and the statutory construction directives mentioned above.

> In the case of predial estates, this right embraces every thing that serves for the labors of the farm, the furniture of the lessee's house, and the fruits produced during the lease of the land; and in the case of houses or other edifices, it includes the furniture of the lessee, and the merchandise contained in the house or apartment, if it be a store or shop.
>
> La.Civ.Code art. 2675 (1825).
>
> The third paragraph of Article 2705 was enacted not as an amendment of Article 2675, but rather as an independent statute, being Act No. 23 of 1852, approved February 11, 1852, and which provided:
>
> > That the lessee shall be entitled to retain, out of the property subjected by law to the lessor's

Despite exhaustive research, the Court has not been able to find any cases dealing with the issue of whether a debtor's firearms constitutes "arms and military accoutrements," within the meaning of section 13:3881. Nevertheless, Louisiana case law is clear that the *purpose* underlying La.R.S. 13:3881 is to provide for the subsistence, welfare, and "fresh start" of the debtor, to the end that his or her family will not be destitute and so that the debtor will not become a charge on the state. *Ward v. Turner*, 150 B.R. 378 (E.D.La.1993), *opinion after remand*, 176 B.R. 424 (E.D.La.1994), *appeal dismissed by Matter of Ward*, 66 F.3d 322 (5th Cir.1995) (TABLE, No. 95–30089); *In re Hendrick*, 45 B.R. 965 (Bankr.M.D.La. 1985). Moreover, in construing section 13:3881, and its predecessor, Article 644 of the Louisiana Code of Practice of 1870, the intention of the lawmakers must be carried out and given a broad and liberal interpretation conducive to the purpose of exemption, to the end that the obvious purpose of the statute not be frustrated. *Young v. Geter*, 185 La. 709, 170 So. 240 (1936), *answers to certified questions conformed to* 170 So. 410, 412 (La.Ct.App.1936); *Laurencic v. Jones*, 180 So.2d 803 (La.Ct.App. 4th Cir.1965); *Mounger v. Ferrell*, 11 So.2d 56 (La.Ct. App.2d Cir.1942). Therefore, whenever a claim to exemption under 13:3881 can be brought within the purpose and intent of section 13:3881 by a fair and reasonable interpretation, the exemption will be allowed. *Young v. Geter*, 185 La. 709, 170 So. 240.

Louisiana's liberal construction of exemption statutes is not unlimited, however,

> privilege, his clothes and linen and those of his wife and family; his bed and those of his wife and family; his *arms, military accoutrements*, and the tools and instruments necessary for the exercise of the trade or profession by which he gains his living, and that of his family.
>
> Act No. 23 of 1852, at 13 (emphasis added). *See Young v. Geter*, 185 La. 709, 720, 170 So. 240, 243 (1936).
>
> Article 2675 of the Louisiana Civil Code of 1825 may be traced to Page 322 of the *Projet* of the Civil Code of 1825; Article 74 of the Louisiana Civil Code of 1808; and Article 2102 of the Code Napoleon of 1804.

because exemption statutes, being in derogation of the general rule of non-exemption, must be strictly construed, but not so as to destroy their purpose. *A. Wilbert's Sons Lumber & Shingle Co. v. Ricard,* 167 La. 416, 119 So. 411 (1929). Moreover, exemption laws should be construed *as written,* without adding to them because they are public policy laws, or restricting their application as in derogation of common right. *Rynella Mill & Mercantile Co. v. Segura,* 128 La. 643, 55 So. 2 (1911).

The above discussion of how this Court's plain meaning analysis not only does not lead to absurd consequences, but can be seen to further the fresh start of the debtor, is sufficient to convince this Court that the jurisprudence analyzing the purpose of the exemption statutes does not offer a possible conclusion in conflict with this Court's analysis of the words themselves.

## 2. Context of the Words in the Text

■ The only property which qualifies as exempt in Louisiana is that which is *specifically* listed in an exemption statute. *Ward v. Turner,* 150 B.R. 378 (E.D.La.1993). As mentioned, the debtor claimed the Firearms as exempt under Section 3881(4)(c), the only reference to weapons within the exemption statute of Louisiana. The general personal property exemptions within La.R.S. 13:3881(4) are reflective of the tension inherent in the purpose of the exemption laws of Louisiana. While the exemptions claimable under section (4) are not limited by an aggregate or categorical amount, the items of property exemptible are specifically designated. La.R.S. 13:3881(4) reads, in its entirety, as follows:

(4)(a) The clothing, bedding, linen, chinaware, nonsterling silverware, glassware, living room, bedroom, and dining room furniture, cooking stove, heating and cooling equipment, one noncommercial sewing machine, equipment for required therapy, kitchen utensils, pressing irons, washers, dryers, refrigerators, deep freezers, electric or otherwise, used by him or a member of his family.

(b) The family portraits.

(c) His arms and military accoutrements.

(d) The musical instruments played or practiced on by him or a member of his family.

(e) The poultry, fowl, and one cow kept by him for the use of his family.

(f) All dogs, cats, and other household pets.

Examination of the context in which the words "arms and military accoutrements" appear as well does not direct the Court to a search for statutory spirit disembodied from the plain meaning of the words. The exemption reference to "arms and military accoutrements" is set apart as a subsection separate from the listing of what might be generally characterized as the "household goods" subpart.[16] Analysis of section (4)(a) yields no reference to property used for recreational purposes whatsoever, but is limited to property within the house of a kind necessary for maintaining ongoing home life in clean clothes, with a warm bed, using necessary dishes for food and refrigerators for preserving it. The only references to property which could have recreational use are the family portraits; "musical instruments played or practiced on"; and "all dogs, cats and other household pets" subsections (the "fowl, poultry and one cow" exemption is specifically limited by the requirement that such be kept "for the use of his family," i.e., for eggs, meat and/or milk).[17]

So, "arms" is not found within the exemptions for recreational use property. And, in answer to what might be an expected and stirring repartee from a hypothetical hunter—"What about needing guns for game?!"—"arms" is set off separately from the property exempted for the purpose of providing food to the family ("let them eat fowl").

---

16. More on guns as household goods below, though given the Louisiana statute's specific designation of specific (and nonrecreational) categories of household goods within subpart (4)(a), Louisiana has no "household goods" exemption which could cover weapons.

17. The "fowl, poultry and one cow" subsection obviously predates cholesterol consciousness.

"Arms" is, simply, set off separately and lodged in subsection (c) along with "and military accoutrements." "Arms and military accoutrements" stands alone, not for use in the house, not for fun, not for food. Examination of the context of the words in the text as a whole leads the Court back to, not away from, embrace of its plain meaning analysis.

### F. Interpretation of Statute in Relation to Other Laws Dealing With Same Subject Matter.

As mentioned, Article 13 of the Louisiana Civil Code requires that laws "on the same subject matter must be interpreted in reference to one another." [18] The forerunner of Civil Code Article 13 was Article 17, Civil Code of 1870, which, according to the revision comment to Article 13, was reproduced in substance, without changing the law. Article 17 read as follows:

> Laws in *pari materia*, or upon the same subject matter, must be construed with a reference to each other; what is clear in one statute may be called in aid to explain what is doubtful in another.

■ While this provision of the Civil Code was designed primarily as a method of integrating various Code articles, it is clear that reference to differing types of statutory and constitutional pronouncements is not prohibited, as all laws in *pari materia* are to be considered. *Gayle's Heirs v. Williams' Adm'rs*, 7 La. 162 (1834); *Desban v. Pickett*, 16 La.Ann. 350 (1861); *Succession of Hebert*, 5 La.Ann. 121 (1850); *Rouanet v. Hunt*, 17 La. 407 (1841); *Phelps v. Rightor*, 9 Rob. 531 (1845).

In light of the legislative history of the "arms and military accoutrements" provision, the Court will move through statutes and laws dealing with the word "arms," particularly the Constitutions of both the United States and Louisiana, as well as the Louisiana statutes dealing with the state militia.

### 1. The United States Constitution

The United States Constitution, as originally adopted, granted to the Congress the power:

> To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.[19]

■ The Second Amendment to the United States Constitution was made "[w]ith obvious purpose to assure the continuation and render possible the effectiveness of such forces," and "must be interpreted and applied with that end in view." [20] The Second Amendment provides as follows:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

In 1856, the Louisiana Supreme Court construed the meaning of the term "Arms," as used in the Second Amendment. In *State v. Smith*, 11 La.Ann. 633 (1856), the court was presented with a defendant who had been indicted and convicted of carrying a concealed weapon. The defendant argued that Louisiana's statute prohibiting the carrying of a concealed weapon contravened the Second Amendment in that it prevented the defendant from exercising his right to keep and bear arms. In construing the meaning of the term "arms," the court stated as follows:

> The statute against carrying concealed weapons does not contravene the Second Article of the amendments of the United States. *The arms there spoken of are such as are borne by a people in war, or at least carried openly....* This was never intended to prevent the individual

---

18. *See* La.Civ.Code art. 13 (1995).

19. U.S. Constitution art. 1, section 8.

20. *United States v. Miller*, 307 U.S. 174, 178, 59 S.Ct. 816, 818, 83 L.Ed. 1206 (1939).

states from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used not frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke.

*State v. Smith,* 11 La.Ann. 633 (1856) (emphasis added).

The construction of the word "arms" by the Louisiana Supreme Court was seconded by *United States v. Miller,*[21] one of the most important United States Supreme Court cases on the Second Amendment. *Miller* provides an interesting and illustrative history of that amendment, and thus this Court, though it normally refrains from lengthy quotes, will quote at length from that case as follows:

The Militia which the States were expected to maintain and train is set in contrast with Troops which they were forbidden to keep without the consent of Congress. The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia—civilians primarily, soldiers on occasion. The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense. 'A body of citizens enrolled for military discipline.' And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.

Blackstone's Commentaries, Vol. 2, Ch. 13, p. 409 points out 'that king Alfred first settled a national militia in this kingdom' and traces the subsequent development and use of such forces. Adam Smith's Wealth of Nations, Book V. Ch. 1, contains an extended account of the Militia. It is there said: 'Men of republican principles have been jealous of a standing army as dangerous to liberty.' 'In a militia, the character of the labourer, artificer, or tradesman, predominates over that of the soldier: in a standing army, that of the soldier predominates over every other character; and in this distinction seems to consist the essential difference between those two different species of military force.'

'The American Colonies In The 17th Century', Osgood, Vol. 1, ch. XIII, affirms in reference to the early system of defense in New England—'In all the colonies, as in England, the militia system was based on the principle of the assize of arms. This implied the general obligation of all adult male inhabitants to possess arms, and, with certain exceptions, to cooperate in the work of defence.' 'The possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former.' 'A year later (1632) it was ordered that any single man who had not furnished himself with arms might be put out to service, and this became a permanent part of the legislation of the colony (Massachusetts).'

Also 'Clauses intended to insure the possession of arms and ammunition by all who were subject to military service appear in all the important enactments concerning military affairs. Fines were the penalty for delinquency, whether of towns or individuals. According to the usage of the times, the infantry of Massachusetts consisted of pikemen and musketeers. The law, as enacted in 1649 and thereafter, provided that each of the former should be armed with a pike, corselet, head-piece, sword, and knapsack. The musketeer should carry a 'good fixed musket,' not under bastard musket bore, not less than three feet, nine inches, nor more than four feet three inches in length, a priming wire, scourer, and mould, a sword, rest, bandoleers, one pound of powder, twenty bullets, and two fathoms of match. The law also

**21.** *Id.*

required that two-thirds of each company should be musketeers.'

The General Court of Massachusetts, January Session 1784 (Laws and Resolves 1784, c. 55, pp. 140, 142), provided for the organization and government of the Militia. It directed that the Train Band should 'contain all able bodied men, from sixteen to forty years of age, and the Alarm List, all other men under sixty years of age, * * *.' Also, 'That every non-commissioned officer and private soldier of the said militia not under the control of parents, masters or guardians, and being of sufficient ability therefor in the judgment of the Selectmen of the town in which he shall dwell, shall equip himself, and be constantly provided with a good fire arm, &c.' By an Act passed April 4, 1786 (Laws 1786, c. 25), the New York Legislature directed: 'That every able-bodied Male Person, being *181 a Citizen of this State, or of any of the United States, and residing in this State, (except such Persons as are herein after excepted) and who are of the Age of Sixteen, and under the Age of Forty-five Years, shall, by the Captain or commanding Officer of the Beat in which such Citizens shall reside, within four Months after the passing of this Act, be enrolled in the Company of such Beat. * * * That every Citizen so enrolled and notified, shall, within three Months thereafter, provide himself, at his own Expense, with a good Musket or Firelock, a sufficient Bayonet and Belt, a Pouch with a Box therein to contain not less than Twenty-four Cartridges suited to the Bore of his Musket or Firelock, each Cartridge containing a proper Quantity of Powder and Ball, two spare Flints, a Blanket and Knapsack; * * *.' The General Assembly of Virginia, October, 1785 (12 Hening's Statutes c. 1, p. 9 et seq.), declared: 'The defense and safety of the commonwealth depend upon having its citizens properly armed and taught the knowledge of military duty.' It further provided for organization and control of the Militia and directed that 'All free male persons between the ages of eighteen and fifty years,' with certain exceptions, 'shall be inrolled or formed into companies.' 'There shall be a private

muster of every company once in two months.' Also that 'Every officer and soldier shall appear at his respective musterfield on the day appointed, by eleven o'clock in the forenoon, armed, equipped, and accoutred, as follows: * * * every non-commissioned officer and private with a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel, with a good bayonet and iron ramrod well fitted thereto, a cartridge box properly made, to contain and secure twenty cartridges fitted to his musket, a good knapsack and canteen, and moreover, each non-commissioned officer and private shall have at every muster one pound of good powder, and four pounds of lead, including twenty blind cartridges; and each serjeant shall have a pair of moulds fit to cast balls for their respective companies, to be purchased by the commanding officer out of the monies arising on delinquencies. Provided, That the militia of the counties westward of the Blue Ridge, and the counties below adjoining thereto, shall not be obliged to be armed with muskets, but may have good rifles with proper accoutrements, in lieu thereof. And every of the said officers, non-commissioned officers, and privates, shall constantly keep the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for by his commanding officer. If any private shall make it appear to the satisfaction of the court hereafter to be appointed for trying delinquencies under this act that he is so poor that he cannot purchase the arms herein required, such court shall cause them to be purchased out of the money arising from delinquents.'

Most if not all of the States have adopted provisions touching the right to keep and bear arms. Differences in the language employed in these have naturally led to somewhat variant conclusions concerning the scope of the right guaranteed. *Id.*, 307 U.S. at 178–182, 59 S.Ct. at 818–820.

*Corpus Juris Secundum,* while never a primary source for judicial authority, is instructive in that it cites *State v. Smith* and *United States v. Miller* for the proposition that "arms," as used in the Second Amend-

ment, means military arms, rather than personal firearms:

> As used in constitutional guaranties with respect to the bearing of arms, the word 'arms' means such weapons as are adapted to the efficiency of the citizen as a soldier, and are carried openly [citing *State v. Smith* ], the ordinary arms or military equipment needed and used by the militia, or those arms which are usually employed in warfare [citing *U.S. v. Miller* ], or which were so employed when the constitutional provisions were adopted, such as rifles, shotguns, or muskets, and swords, except ... swords concealed in canes. Such definitions have been formulated by courts which have been influenced by references in a number of constitutions to the necessity of a well regulated militia or to the dangers inherent in the maintenance of standing armies.

*Corpus Juris Secundum, Weapons,* Section 2b, at 473–474.

*United States v. Miller,* therefore, establishes that the term "arms," as used in the Second Amendment, was intended to provide for the right to maintain a well-regulated state militia (as opposed to a standing army), and did not refer to or extend a right to persons to keep and bear arms for their person.[22]

### 2. The Louisiana Militia

Like the New England militias described in *United States v. Miller,* Louisiana also has its own militia, consummated by the Louisiana Militia Act of March 8, 1834, entitled the *Acte pour pourvoir a l'organisation et a la discipline de la milice de l'Etat de la Louisiane, approuve le 10 Mars 1834* (the "1834 Militia Act"). Section 1 of the 1834 Militia Act provided as follows:

> That the militia of the State of Louisiana shall be composed of all free white males residing in the State, and who have resided there two months and are eighteen years of age and not yet forty five, and who are

not exempt under the laws of the United States or under the provisions of this law; provided however that no such person who is not a citizen of the United States, shall be compelled to serve against the country to which he owes his allegiance.

1834 Militia Act of March 8, 1834, section 1 (1834).

Section 50 of the 1834 Militia Act gave the sergeant of each company the duty to make an accurate enrollment of all persons subject to militia duty within the bounds of his company, and sections 51 and 52 provided that *every* person subject to militia duty was *bound* to have himself enrolled, with the first enrollment of each company being made in March, 1834, and in the month of February of every succeeding year. Enrolled males were subject to a three month service at one time, unless an "urgent necessity" arose (section 75), except that volunteers, other than in time of war or actual insurrection, were to be called upon to make one town of patrol or guard duty only, compared with three by the regular militia (section 94).

Every officer of the militia had the authority, in cases of sudden and urgent danger, to call his command into immediate service (section 76). Furthermore, the mayor or chief magistrate of the cities and towns was authorized to demand detachments of the militia in certain cases (section 87), and the commander in chief was given the authority, whenever he was of the opinion that the public safety required it, to order out any portion of the militia of the State and to require such portion to perform any service or duty necessary for the public security (section 74).

Not surprisingly, the 1834 Militia Act refers to "arms" and "accoutrements" more than once, and each time the reference is in the context of military usage. For example, section 14 of the 1834 Militia Act gave the adjutant and the inspector general the charge of all the "arms, munitions and accou-

---

22. *Id. See also United States v. Cruikshank,* 92 U.S. (2 Otto) 542, 23 L.Ed. 588 (1875); *State v. Amos,* 343 So.2d 166 (La.1977). With regard to the *federal* militia, Article I, section 8, clause 15 of the United States Constitution empowers Congress to provide for calling forth the militia to execute the laws of the Union, to suppress insur-

rections, to repel invasions, to provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States. The States, however, have the responsibility to train the militia. *See, generally, Corpus Juris Secundum, Armed Services,* section 15, at 556–57.

trements" belonging to the State; section 52 cautioned that "[n]o excuse will be received for not being armed;" section 54 provided that "the second class shall not be required to bear arms except in case of urgent necessity"; section 61 provided that the officers and first sergeants of each brigade were to be "armed and equipped"; section 62 provided that the governor was authorized to procure tents and camp equipage and "ammunition sufficient for all the brigades of the State"; section 74 provided that when the commander in chief called upon the troops, they were to be furnished with "necessary ammunition and equipage"; section 80 provided that "all the arms and munitions of war belonging to the State shall be under the superintendence of the adjutant and inspector general," that the governor had the duty to appoint persons to keep all "arms and accoutrements and equipage" in the public arsenal in good and constant repair, and that the governor had the authority to order all "arms and equipage" that were damaged so as to be unfit for service, to be sold; section 81 provided that "arms shall be issued from the public arsenals on to the chiefs of battalions"; and section 82 provided that the adjutant general and the division and brigade inspectors had the right to take all "arms and military property" belonging to Louisiana, wherever they might be found, except when they were found in the hands of members of volunteer companies or of persons in actual service of Louisiana or of the United States.

The 1834 Militia Act was replaced by the Militia Act of 1904 (Act. No. 101) (the "1904 Militia Act"), which was entitled "An Act Relative to the Militia of the State, and the Louisiana State National Guard: To enroll and organize the same, and to fix the term of service therein." Section 1 of the 1904 Militia Act provided as follows:

Be it enacted by the General Assembly of the State of Louisiana, That the Militia of the State of Louisiana shall be composed of all able-bodied male citizens thereof between the ages of eighteen and forty-five years, who are not disfranchised by the laws of the United States and of this State.

1904 Militia Act, section 1 (1904).

Like the 1834 Militia Act, the 1904 Act set forth two classes: (1) the active militia, which was comprised of the organized and uniformed military forces of the State (the National Guard of Louisiana); and (2) the reserve militia, which was comprised of all those males liable to service in the militia and the Naval Militia, but who were not serving in the National Guard of Louisiana (section 6).

The 1904 Militia Act had fewer references to "arms" than did the 1834 Militia Act, but like the 1834 Militia Act, the 1904 Militia Act referred to "arms" in the context of the military only. Section 5 of the 1904 Militia Act provided that in case of "insurrection, invasion, tumult, riot, breaches of the peace or imminent danger thereof, the Governor may ... direct the Quartermaster General to purchase such military property as may be required;" section 6 provided that the Quartermaster General had a duty to render annually to the Governor a statement in detail showing the disposition of "arms, ammunition, and other military property on hand or issued"; section 23 provided that no "military property" could be issued to persons or organizations other than those belonging to the active militia, except to such portions of the reserve militia as may have been called out by the Governor; section 63 provided that no honorable discharge would be available to the enlisted man until he had returned "all the property for which he is responsible"; section 100 prohibited the unlawful conversion of property, such as "arms, uniforms, equipments, or other military property," issued under the 1904 Militia Act; and section 102 provided that the regularly organized corps, when called into the service of the State, would be equipped and paid by the State.

Currently, Louisiana's militia is provided for in Title 29 of the Louisiana Revised Statutes, entitled "Military, Naval, and Veterans' Affairs," in which section 3 provides that the militia of Louisiana is constituted by all able-bodied persons between the ages of seventeen and sixty-four residing in Louisiana, who are not exempt by the law of the United States or of Louisiana. The unorganized militia, which consists of all persons subject to military duty other than those persons in the National Guard, the Louisiana State

Guard, and other organized military forces (section 3), is subject to active military duty only when called into the service of Louisiana or of the United States.

Like the New England militias described in *United States v. Miller*, which militias were organized pursuant to the authority of the Second Amendment of the U.S. Constitution, Louisiana's militia also was organized under the auspices of the Second Amendment. As has been discussed, *United States v. Miller* established that the Second Amendment called for the right to bear arms in the context of state militia duty only, rather than in the context of the individual's right to bear arms. Therefore, it is reasonable for the court to conclude that Louisiana's militia, which has formally been in existence since 1834 (the Court concludes that it was informally in existence before this), provides the proper context within which to interpret "arms and military accoutrements." That is, having organized a militia, Louisiana then had the responsibility to equip this militia, and the most efficient means of equipage was, in the Court's view, to exempt debtors' "arms and military accoutrements" from seizure. In this context, exemption of military arms and military accoutrements, rather than merely firearms for personal use, makes eminent sense.

### 3. The Louisiana Constitution

*Corpus Juris Secundum* states the following regarding the meaning of the term "arms," with regard to state constitutions which guarantee every person the right to bear arms *for the defense of himself* and the State:

> It has been held that the meaning of the term 'arms,' especially when found in constitutional provisions guaranteeing to every person the right to bear arms for the defense of himself and the state, cannot properly be confined within the limits fixed by the historical and military test [citing *Bliss v. Commonwealth*, 2 Litt. 90 (Ky.) ], but must be deemed to include arms customarily kept by law-abiding citizens for their protection. [citing *Michigan People v. Brown*, 253 Mich. 537, 235 N.W. 245 [ (1931) ]].

*Corpus Juris Secundum, Weapons*, Section 2b, at 474.[23]

Unlike state constitutions which grant all persons the right to bear arms *for the defense of that person* and the State, the early Louisiana Constitutions *did not* grant the individual the right to keep and to bear arms. Interestingly, the Louisiana Constitutions of 1812, 1845, 1852, 1861, 1864, and 1868, did not have any provision on the right "to keep and bear arms." It was not until 1879 that the Bill of Rights of the Louisiana Constitution provided for a right "to keep and bear arms," which was limited to a "well regulated militia." This provision mirrored the Second Amendment to the United States Constitution, and provided as follows:

> **Art. 3.** A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed.

Louisiana Constitution, Bill of Rights, art. 3 (1879).

This provision remained in the Louisiana Constitutions of 1898 and 1913, although in these Constitutions the provision was set forth in Article 8 of the Bill of Rights, rather than in Article 3. Article I, section 8 of the Louisiana Constitution of 1921 also provided identically.

This provision being almost identical to the Second Amendment to the United States Constitution, it is reasonable for the Court to conclude that the term "arms" in this provision meant military arms used for military purposes, rather than arms that the individual would use for personal purposes, such as hunting or self defense.

In 1974, however, the Louisiana Constitution of 1921 was amended, and former Article I, section 8 of the Constitution of 1921 was replaced with new Article I, section 11, which provides:

> The right of each citizen to keep and bear arms shall not be abridged, but this provision shall not prevent the passage of laws

23. *See State v. Kessler*, 289 Or. 359, 614 P.2d 94 (1980).

to prohibit the carrying of weapons concealed on the person.

La. Const. art. I, section 11 (1974).

Professor Lee Hargrave has written about this revision as follows:

A tentative committee draft of this section had continued the reference to the militia in defining the right to keep and bear arms, as in the United States Constitution and the 1921 Constitution. The final committee proposal omitted that reference and was adopted by the convention in this respect. Thus, it would seem that the right is established without the reference to a militia, a reference that could have indicated that the right could be limited to participation or service in a militia. [Professor Hargrave here cites *United States v. Miller* and *Cody v. United States*, 460 F.2d 34 (8th Cir.1972), *cert. denied*, 409 U.S. 1010, 93 S.Ct. 454, 34 L.Ed.2d 303 (1972).] Since it is a right of 'each citizen,' it is clearly not a reference to a right of a state to maintain its militia as the federal provision has at times been construed. [Professor Hargrave here cites *Stevens v. United States*, 440 F.2d 144 (6th Cir.1971).] Federal regulation in this area, of course, is pervasive and continues to establish strong gun controls.... An early draft had also referred to the right to bear 'arms and ammunition,' but the final committee proposal and the final section omit the reference to ammunition. It was thought unnecessary to add that reference, since 'ammunition' would be implied from the right to bear arms. Beyond this, the record gives little definition of the scope of the 'arms' that one has a right to keep and bear. It does indicate a knowledge of existing laws prohibiting sawed off shotguns and machine guns. [Professor Hargrave cites La.R.S. 40:1781–91 (1950).] Continuation of the wording of the 1921 provision in this respect with the knowledge of how it has been understood suggests that those statutes would not be overturned.

Lee Hargrave, *The Declaration of Rights of the Louisiana Constitution of 1974*, 35 La. L.Rev. 1, 35–37 (1974).

Thus, both the Second Amendment to the United States Constitution and the Louisiana Constitutions of 1879, 1898, 1913, and 1921 referred to the collective right "to keep and bear arms" to support the militia. In contrast, the Louisiana Constitution of 1974 strengthens the rights of individual citizens to keep and to bear arms, with no reference to a militia. Thus, Article I, section 11 of the 1974 Louisiana Constitution protects the right of the individual citizen to keep and bear arms, setting out that right in absolute terms, subject only to the proviso that the Legislature maintains the authority to prohibit and regulate firearms concealed on one's person.[24]

Let it be recalled that in 1960, when the Louisiana Constitution of 1921 was in effect, La.R.S. 13:3881 replaced Article 644 of the Louisiana Code of Practice of 1870. More specifically, section 13:3881(A)(4)(c), which exempts "arms and military accoutrements," was enacted in 1960, under the auspices of the 1921 Constitution. Therefore, it is reasonable for the Court to conclude that the Legislature, in enacting section 13:3881(A)(4)(c), used "arms and military accoutrements" in the same context as did Article I, section 8 of the 1921 Constitution, namely, in the context of a well-regulated militia. This conclusion is buttressed by the fact that notwithstanding the Louisiana Constitution's revisions in 1974, the Louisiana Legislature has not amended section 13:3881(A)(4)(c) to mirror Article I, section 11 of the 1974 Constitution, which, as has been stated, amended Article I, section 8 of the 1921 Constitution to reflect an endorsement of the individual's right to keep and bear arms.

Thus, both the Second Amendment to the United States Constitution and Article I, section 8 of the 1921 Louisiana State Constitution suggest that the phrase "arms and military accoutrements" in La.R.S. 13:3881(A)(4)(c) may be limited to arms and military accoutrements which are used both

---

**24.** *See State v. Chaisson*, 457 So.2d 1257 (La.Ct. App. 1st Cir.1984); *State v. Amos*, 343 So.2d 166 (La.1977); *State v. Hamlin*, 497 So.2d 1369 (La. 1986); *State v. Wiggins*, 432 So.2d 234 (La.1983).

defensively and offensively for war, that is, implements or weapons used in fighting and battle, rather than weapons used for solely personal purposes, such as hunting.

### 4. Statutes and Case Law from other Jurisdictions

Despite exhaustive research on the issue before the Court, the Court, as noted, has not found any Louisiana case law on this topic. Therefore, the Court will explore the statutes and jurisprudence of other states dealing with the exemption of arms (or that could be interpreted as providing an exemption for arms). For brevity's sake, and as a result of extensive in-chambers computer expertise, examples of the various exemption statutes analyzed by this Court which mention "arms" or "firearms," which contain some specific mention of a variation of these terms, or which contain a blanket personal property exemption (subject, say, to a limitation in amount) are provided by the following chart.

### STATE EXEMPTION STATUTES REGARDING FIREARMS

| STATE | HEADING OF STATUTE | PROPERTY EXEMPT |
|---|---|---|
| Alabama | "Personal uniforms, arms, etc. of officers, enlisted men, etc., exempt from sale under execution, etc." | "personally owned uniforms, arms and equipment, required by laws or regulations of every commissioned, warrant and non-commissioned officer, musician and enlisted man of the armed forces of the state" [25] |
| Alabama | "Personalty" | "The personal property of such resident, except for wages, salaries or other compensation, to the extent of the resident's interest therein, to the amount of $3,000.00 in value, to be selected by him or her, and, in addition thereto, all necessary and proper wearing apparel for himself or herself and family, all family portraits or pictures and all books used in the family shall also be exempt from levy and sale under execution or other process for the collection of debts." [26] |
| Arizona | "Personal Items" | "one typewriter, one bicycle, one sewing maching, a family bible, a lot in any burial ground, one shotgun or rifle or one pistol, not in excess of an aggregate fair market value of five hundred dollars" [27] |
| Arizona | "Tools and equipment used in a commercial activity, trade, business or profession." | "all arms, uniforms and accoutrements required by law to be kept by a debtor." [28] |

**25.** Alabama Code section 31–2–78.

**26.** Ala.Code section 6–10–6.

**27.** Ariz.Rev.Stat.Ann. section 33–1125(7).

**28.** Ariz.Rev.Stat.Ann. section 33–1130.

| | | |
|---|---|---|
| Connecticut | "Property exempt" | "[a]rms and military equipment, uniforms or musical instruments owned by any member of the militia or armed forces of the United States." [29] |
| Delaware | "Exemptions in bankruptcy and insolvency." | "In any federal bankruptcy or state insolvency proceeding, an individual debtor domiciled in Delaware shall be authorized to exempt from the bankruptcy or insolvency estate property having an aggregate fair market value of not more than $5,000." [30] |
| Idaho | "Exemptions of personal property subject to value limitations" | "furniture and appliances reasonably necessary for one household, including one firearm" [31] and "[a]ll arms, uniforms and accounterments [sic] required for the use of an individual as a peace officer, a member of the national guard or military service." [32] |
| Indiana | "Exemptions from execution" | "uniforms, arms and equipments of every member of the national guard, together with any military property of any detachment company, battery, battalion, regiment, division, air squadron or group." [33] |
| Iowa | "General Exemptions" | "[o]ne shotgun, and either one rifle or one musket." [34] |
| Maine | "Exemption from attachment and distress" | "clothes, arms, military outfit and accoutrements furnished by or through the State to, or required of, a member of the state military forces" [35] |
| Massachusetts | "Property exempt from execution" | "uniform of an officer or soldier in the militia and the arms and accoutrements required by law to be kept by him" [36] |
| Michigan | "Property, insurance benefits, and homesteads exempt" | "All family pictures, all arms and accoutrements required by law to be kept by any person, all wearing apparel for every person or family, and provisions and fuel for comfortable subsistence of each householder and his or her family for 6 months." [37] |

29. Conn.Gen.Stat. section 52–352b(*I*).

30. Del.Code Ann. tit. 10, section 4914.

31. Idaho Code section 11–605(1)(a).

32. Idaho Code section 11–605(5).

33. Indiana Code Ann. section 10–2–6–3.

34. Iowa Code Ann. section 627.6(2).

35. Maine Rev.Stat.Ann. tit. 37–B, section 262.

36. Mass.Gen.Laws Ann. ch. 235, section 34 (Tenth).

37. Mich.Comp.Laws Ann. section 600.6023(1)(a) (emphasis added).

| | | |
|---|---|---|
| Montana | "Personal property exempt subject to value limitations" | "the judgment debtor's interest, not to exceed $4,500 in aggregate value, to the extent of a value not exceeding $600 in any item of property, in household furnishings and goods, appliances, jewelry, wearing apparel, books, firearms and other sporting goods, animals, feed, crops, and musical instruments" [38] |
| Montana | "Personal property necessary to carry out governmental functions" | "all uniforms, and accoutrements required by law to be kept by any person and one gun to be selected by the debtor." [39] |
| Nevada | "Property exempt from execution" | "All arms, uniforms, accouterments required by law to be kept by any person, and also one gun, to be selected by the debtor" [40] |
| New Hampshire | "Exemptions" | "uniform, arms and equipments of every officer and private in the militia" [41] |
| Oklahoma | "Property exempt from attachment, execution or other forced sale; bankruptcy proceedings" | "One gun, that is held primarily for the personal, family or household use of [the debtor] or a dependent of such person" [42] |
| Oregon | "Exemption of firearms" | "Every citizen of this state above the age of 16 years shall be entitled to have, hold and keep, for the ... use and defense of the citizen and shall have exempt from execution one rifle or shotgun and one pistol" but "the combined value of all firearms claimed as exempt under this section may not exceed $1,000." [43] |
| Texas | "Personal Property" | "two firearms" [44] |
| Utah | "Military property exempt from civil process" | "All military property issued to or owned by members of the national guard" [45] |
| Virgin Islands | "Property exempt from attachment" | "uniforms, arms, ammunition, and equipment of every officer and member of the National Guard of the Virgin Islands" [46] |

**38.** Montana Code Ann. section 25–13–609(1)(b) (emphasis added).

**39.** Montana Code Ann. section 25–13–613. *See In re Mutchler,* 95 B.R. 748 (Bankr.D.Mont. 1989).

**40.** Nevada Rev.Stat. section 21–090(1)(I).

**41.** N.H.Rev.Stat.Ann. section 511:2(VII).

**42.** Okla.Stat.Ann. tit. 31, section 1(A)(14).

**43.** Oregon Rev.Stat. section 23.200.

**44.** Tex.Prop.Code section 42.002(a)(7).

**45.** Utah Code Ann. section 39–1–47.

**46.** V.I.Code Ann. tit. 23, section 1529.

| Virginia | "Military property exempt from levy and sale" | "uniforms, arms and equipment required by law or regulations of every commissioned and warrant officer and every enlisted person of the Virginia National Guard, Virginia State Defense Force and naval militia" [47] |
| Wisconsin | "Property exempt from execution" | "Consumer goods. Household goods and furnishings, wearing apparel, keepsakes, jewelry and other articles of personal adornment, appliances, books, musical instruments, firearms, sporting goods, animals or other tangible personal property held primarily for the personal, family or household use of the debtor or a dependent of the debtor, not to exceed $5,000 in aggregate value." [48] |

From the above chart of other states' exemption statutes, it is apparent that roughly four categories of state exemption statutes concerning arms or weapons are predominant: (1) those statutes exempting arms and military accoutrements, but not exempting firearms or guns as personal property (e.g., in the context of consumer goods); (2) those statutes exempting specific types of personal property (e.g., consumer goods), including firearms, but not specifically exempting arms and military accoutrements; (3) those statutes exempting arms and military accoutrements, on the one hand, *and* creating a separate exemption for firearms and guns as personal items, on the other hand; and (4) those statutes exempting firearms by means of a blanket "personal property" exemption (subject, say, to some limitation in amount). Louisiana, as has been noted, falls within the category of statutes which exempt arms and military accoutrements *only*, without separately exempting firearms, for example, in the context of sporting goods or other personal property.

The above general categories of state exemption statutes strongly indicate that La. R.S. 13:3881(A)(4)(c)'s exemption of "arms and military accoutrements" was meant to exempt a category of arms substantively different from firearms used for personal purposes. Unlike other state exemption statutes which exempt firearms in the context of consumer goods, such as sporting goods, or

within a blanket personal property exemption, Louisiana has intentionally chosen to restrict firearm exemptions to those firearms which fall within the limited scope of "arms and military accoutrements."

Clearly, Louisiana could have carved out a separate personal property exemption for firearms, but since the *Projet* of the Code of Practice of 1825, Louisiana has chosen not to follow states which exempt arms and military accoutrements and separately exempt firearms as personal property, and also has chosen not to follow states which carve out a "personal property" exemption which would allow a debtor to claim firearms because they constitute "personal property." Therefore, it is reasonable for the Court to conclude that La.R.S. 13:3881(A)(4)(c) covers *military* arms and military accoutrements only, rather than including firearms used for personal purposes.

In this connection, the Court notes that *In re Mutchler*, 95 B.R. 748 (Bankr.D.Mont. 1989), though not of precedential value to this Court, provides an analysis dealing with a state law containing two categories of exemption. Just as importantly, *Mutchler*, without precisely saying so, supports this Court's initial plain meaning analysis, particularly of the effect of the use of the conjunctive "and" (which, ironically, supports this Court's ultimate conclusion that resort to *Mutchler* is unnecessary).

**47.** Va.Code section 44–96.

**48.** Wis.Stat.Ann. section 815.18(3)(d).

In *Mutchler,* the court held that Chapter 12 farmer/debtors, whose case had been converted to Chapter 7, could not claim guns and rifles as exempt under Mont.Code Ann. section 25–13–613, the governmental function exemption discussed *supra* in the exemption chart above. The court noted that the purpose of section 25–13–613 was to allow *law enforcement personnel,* rather than farmers, to exempt from execution all necessary arms and guns required by such persons *to keep the peace.* The court therefore denied the debtors' claim of exemption under section 25–13–613, because this provision did not allow a *farmer* an *additional* exemption for guns or firearms. The court reasoned that through Mont.Code Ann. section 25–13–609(1), Montana already had afforded the debtors a personal property exemption, not to exceed $4,500 in aggregate value. Within this personal property exemption was included the right to exempt, *inter alia,* "firearms and other sporting goods," to the extent of a value not exceeding $600 in any item. Crucial to the court's holding was that the debtors already had used up their $4,500 personal property exemption with a boat, a boat trailer, a snowmobile, a motorcycle, and other items, and, having used up the personal property exemption, were attempting to fit their firearms within Montana's governmental function exemption because resort to their personal property exemption was no longer available.

As mentioned, the *Mutchler* case also embraces the same conclusion about the meaning of terms when joined by the word "and." Recall (remember the chart) that the governmental function exemption provision in Montana reads: "all uniforms, and accoutrements required by law to be kept by any person and one gun to be selected by the debtor."

The "one gun to be selected by the debtor" clause is seen by the Court as modifying the preceding phrase, or, given the conjunctive "and," to be read within the context of the joined terms. The *Mutchler* court, therefore, limits the right to exempt "one gun to be selected by the debtor" (which, standing alone, would mean "any one gun . . .") by the preceding context created by the "all uniforms and accoutrements required by law . . ." phrase, so that the "one gun" must be a gun required to be kept by law, to round out the uniforms and accoutrements, also required by law to be kept.

Boiled to its bones, the *Mutchler* court was dealing, effectively, with the exact issue before this Court—no place to exempt a personal-use gun except within an "arms and military accoutrements"-like statute. Of course, *Mutchler* had the luxury of an additional (though used-up) exemption provision, against which it could analytically offset the governmental-function exemption language. Though this Court does not share this analytical luxury, given that Louisiana has no additional exemption provision into which firearms could be placed, the analysis is unchanged.

The Court finally notes that in specifically exempting only "arms and military accoutrements," Louisiana has chosen not only to reject enacting a personal property exemption specifically including firearms or which grants a blanket exemption covering all personal property up to an aggregate value, Louisiana also has chosen to reject an *in globo* "household goods" exemption which, conceivably, could include firearms used for personal purposes.[49] A few examples of such statutes are set forth in the following chart.

---

**49.** In fact, the federal exemption scheme, particularly § 522(d)(3), is an example of a general "household goods" exemption. Section 522(d)(3) provides an exemption of the debtor's interest, not to exceed $400 in value in any particular item or $8,000 in aggregate value, in household furnishings, household goods, wearing apparel, appliances, books, animals, crops, or musical instruments, that are held "primarily for the personal, family, or household use of the debtor or a dependent of the debtor."

## STATE "HOUSEHOLD GOODS" EXEMPTION STATUTES

| STATE | HEADING OF STATUTE | PROPERTY EXEMPT |
|---|---|---|
| California | "Election of exemptions if bankruptcy petition is filed." | "The debtor's interest, not to exceed two hundred dollars ($200) in value in any particular item, in household furnishings, household goods, wearing apparel, appliances, books, animals, crops, or musical instruments, that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor." [50] |
| California | "Household furnishings and personal effects." | "Household furnishings, appliances, provisions, wearing apparel, and other personal effects . . . [i]f ordinarily and reasonably necessary to, and personally used or procured for use by, the judgment debtor and members of the judgment debtor's family at the judgment debtor's principal place of residence." [51] |
| Colorado | "Property exempt." | "The household goods owned and used by the debtor and used by his dependents to the extent of fifteen hundred dollars in value." [52] |
| Georgia | "Exemptions for the purpose of bankruptcy; intestate insolvent estates." | "The debtors' interest, not to exceed $200.00 in value in any particular item, in household furnishings, household goods, wearing apparel, appliances, books, animals, crops, or musical instruments that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor. The exemption of the debtor's interest in the items contained in this paragraph shall not exceed $3,500.00 in total value." [53] |

**50.** Cal.Civ.Proc.Code section 703.140(b)(3).

**51.** Cal.Civ.Proc.Code section 704.020(a)(1). For a case holding that firearms are not "household goods," *see In re Eveland*, 87 B.R. 117 (Bankr. E.D.Cal.1988).

**52.** Colo.Rev.Stat. section 13–54–102(1)(e). *See In re Greenlee*, 61 B.R. 257 (Bankr.D.Colo.1986) (debtors, who used guns for hunting and who ate the game they killed, but who failed to present evidence that they and their family would be unable to support and feed themselves without hunting, primarily used guns as "recreational items," and thus guns were not exempt as "household goods" under Colorado exemption statute).

**53.** Ga.Code Ann. section 44–13–100(a)(4). For a case holding that firearms do constitute "household goods" and therefore are exempt, *see Matter of Raines*, 170 B.R. 187 (N.D.Ga.1994).

| Maryland | "Exemptions from execution." | "The debtor's interest, not to exceed $500 in value, in household furnishings, household goods, wearing apparel, appliances, books, animals kept as pets, and other items that are held primarily for the personal, family, or household use of the debtor or any dependent of the debtor." [54] |
|---|---|---|
| Missouri | "Property exempt from attachment and execution." | "Household furnishings, household goods, wearing apparel, appliances, books, animals, crops or musical instruments that are held primarily for personal, family or household use of such person or a dependent of such person, not to exceed one thousand dollars in value in the aggregate." [55] |
| South Carolina | "Property exempt from attachment, levy, and sale." | "The debtor's interest, not to exceed two thousand five hundred dollars in aggregate value in household furnishings, household goods, wearing apparel, appliances, books, animals, crops, or musical instruments, that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor." [56] |

Though this Court would probably be constrained to find that firearms are not "household goods," [57] it need not formally so advise (as there is no such exemption provision in Louisiana law). The aforementioned statutes and cases dealing with a "household goods" exemption are offered merely as the last nail used in the construction of the analytical support for the statutory construction effort upon which the Court embarked.

Suffice it to say that the Louisiana legislature could, at least, have clouded the water regarding whether there was a separate repository for a firearm exemption, through use of a general "household goods" exemption provision. It has not done so.

54. Md.Cts. & Jud.Proc.Code Ann. section 11–504(b)(4). For Maryland cases holding that firearms are not "household goods," see McGreevy v. ITT Financial Services (In re McGreevy), 955 F.2d 957 (4th Cir.1992) (appeal from Maryland federal district court); In re Barnes, 117 B.R. 842 (Bankr.M.D.Md.1990).

55. Mo.Ann.Stat. section 513.430(1). For Missouri cases holding that firearms are not "household goods," see In re Oglesby, 98 B.R. 960 (Bankr.E.D.Mo.1989); In re Gray, 87 B.R. 591 (Bankr.W.D.Mo.1988); Oswald v. ITT Financial Services, 85 B.R. 541 (W.D.Mo.1986); and In re Cole, 15 B.R. 322 (Bankr.W.D.Mo.1981). For a Missouri case holding that firearms are "household goods," see In re Ray, 83 B.R. 670 (Bankr. E.D.Mo.1988).

56. S.C.Code Ann. section 15–41–30(3). See In re Stroman, 78 B.R. 785 (Bankr.D.S.C.1987) (debtor's magnum pistol and semiautomatic gun were not "household goods" because such property was not specifically exempted under the South Carolina exemption statute).

57. For example, the bankruptcy court in Matter of Raines, 161 B.R. 548 (Bankr.N.D.Ga.1993), found that handguns fell within a general household goods exemption, as such were "commonly used to protect the home and its occupants ..." and to "support and facilitate daily household living." Matter of Raines, at 551. The district court opinion at 170 B.R. 187, affirms this fact finding. Notwithstanding this firmly embraced "frontiersy" approach to defense, there is no mention in the opinion of any evidence that the handguns at issue had ever actually been used for defense or that such a means of defense was even necessary; and there certainly is no mention of any evidence which might tend to show that existence of handguns in the home might constitute a constraint against daily "living," by bringing about daily dying or injury, etc.

### Conclusion

This Court has utilized its limited linguistic acuity (aided by various dictionaries and grammatical analyses) to determine the plain meaning of "arms and military accoutrements" within La.R.S. 13:3881(A)(4)(c), and has concluded that the only exemption provided is for arms kept for military purposes.[58] Resort to the other accepted methods of statutory construction has confirmed, to this Court's satisfaction, the correctness of its plain meaning analysis.

The guns claimed in this case are not exempt because they are not arms kept for military purposes. A separate Order will issue.[59]

---

**58.** Though not considered in this opinion, but worthy of brief mention, is the possibility that firearms might be subject to exemption under Section 13:3881(a)(2)—"That property necessary to the exercise of a trade, calling, or profession by which he earns his livelihood, which shall be limited to the following: (a) Tools. (b) Instruments." (Subsections (c) and (d) omitted.) The debtor here is not a policeman and has not suggested a need for this many weapons as necessary for any other trade, calling or profession.

**59.** Because these reasons constitute the now-prevailing law in this district (there is only one judge here), a copy of these reasons is to be sent to all trustees in this district and, as well, the office of the United States Trustee, for the purpose of providing the basis for future case administration, here, consistent with this opinion.