EASTERBROOK, Circuit Judge.
 

 In 1986 Congress added a new chapter to the Employee Retirement Income Security Act of 1974. 29 U.S.C. §§ 1161-68. Employers providing health care as a fringe benefit must permit some, former employees and their dependents to continue participating in the health plan. (We call all qualified persons “ex-employees,”, glossing over the cases of dependents and divorced spouses that are not important here.) Ex-employees must be given an opportunity to elect coverage, and the plan may charge them a price based on the costs it incurs in covering an average employee. Such coverage is attractive to persons who are ill at the time of their separation from employment or fall ill soon after, for insurers charge higher-than-average prices to persons with known medical problems.
 

 Former employees choose continuation coverage only when that is cheaper than insurance at market prices'. Self-selection means that employers effectively subsidize their ex-employees. Health care as a fringe benefit for productive workers is one thing, and as a gift to persons who have been laid off or fired is another. Employers thus would like to make coverage as scarce as possible. For their part, former employees would like to treat continuation coverage as an option, to be exercised only if they are sure that they face medical costs exceeding the premiums. If they turn out to be healthy, they do not enroll and pay nothing. If medical needs loom, they exercise their option. Such an option destroys the character of the coverage as insurance. Congress attempted to set limits on both kinds of opportunism. It obliged employers to notify separated employees of their options and give them two months to decide. Section 605(1), 29 U.S.C. § 1165(1). Having opted in, employees must pay the first premium within 45 days. If an employee elects coverage, the employer may not throw the insured person out on
 
 *980
 
 a technicality — for example, a premium paid one day late.
 

 In defining the persons covered, and. limiting opportunities for each side to exploit the other, Congress wrote a web of cross-references. Our case arises out of one of these — § 602(2)(C), 29 U.S.C. § 1162(2)(C), which defines how late a payment may be before the employer can terminate the ex-employee’s benefits. This section provides that coverage ceases
 

 by reason of a failure to make timely payment of any premium required under the plan with respect to the qualified beneficiary. The payment of- any premium (other than any payment referred to in the last sentence of paragraph (3)) shall be considered to be timely if made within 30 days after the date due or within such longer period as applies to or under the plan.
 

 The corresponding version of paragraph (3) provided:
 

 The plan may require payment of a premium for any period of continuation coverage, except that such premium—
 

 (A) shall not exceed 102 percent of the applicable premium
 
 †
 
 , for such period, and
 

 (B) may, at the election of the payor, be made in monthly installments.
 

 If an election is made after the qualifying event, the plan shall permit payment for continuation coverage during the period preceding the election to be made within 45 days of the date of the election.
 

 Thus the reference in § 602(2)(C) to the “last sentence” of paragraph 3 was to the 45 days a departing employee had to pay the initial premium. (“Qualifying event” is an elaborately defined term, see § 603, 29 U.S.C. § 1163, the details of which heed not detain us.) There is a 30-day grace period for ordinary premiums, but the employee has 45 days to make the initial payment. Tacking the 45 and 30 day periods is not legally required (although an employer could allow it). The upshot is that the ex-employee has 3V2 months from the notice of eligibility to elect and pay (60 days to elect, 45 more to pay), but an employer need not tolerate longer delay while the employee waits to see whether ailments make the price a bargain.
 

 Cencom Cable Associates discharged Tamera Herrmann under circumstances that made the separation a “qualifying event.” Cencom informed Herrmann of her opportunity to elect continuation coverage. On the 59th day she returned the enrollment form. Cencom promptly advised Herrmann that her first payment was due no later than July 2, 1990, exactly 45 days from the date she enrolled. She did not pay. Fifteen days beyond the outer limit, Herrmann’s lawyer demanded that Cencom accept a tardy initial payment. It refused, and this suit followed. The district judge granted summary judgment to Cencom, ruling that an ex-employee who fails to pay the initial premium within 45 days of the election forfeits entitlement to coverage.
 

 If § 602 still read as originally enacted, no one would have bothered to litigate. Unfortunately Congress made a mess of things in the Omnibus Budget Reconciliation Act of 1989, Pub.L. 101-239, a mammoth collection of unrelated provisions (386 pages in the Statutes at Large) enacted on the last day it met that year. In their rush to get out of town with a bundle of seasonal goodies for their constituents, the Members of Congress neglected such details as cross-references. Section 6703(b), 103 Stat. 2296, provided:
 

 Section 602(3) of such Act (42 [sic] U.S.C. 1162(3)) is amended in the matter after and below subparagraph (B) by adding at the end the following new sentence: “In the case of an individual described in the last sentence of paragraph (2)(A), any reference in subparagraph (A) of this paragraph to ‘102 percent’ is deemed a reference to ‘150 percent’ for any month
 
 *981
 
 after the 18th month of continuation coverage described in clause (i) or (ii) of paragraph (2)(A).”
 

 The amended paragraph 3 then read as follows:
 

 The plan may require payment of a premium for any period of continuation coverage, except that such premium—
 

 (A) shall not exceed 102 percent of the applicable premium for such period, and
 

 (B) may, at the election of the payor, be made in monthly installments.
 

 If an election is made after the qualifying event, the plan shall permit payment for continuation coverage during the period preceding the election to be made within 45 days of the date of the election. In the case of an individual described in the last sentence of paragraph (2)(A), any reference in subparagraph (A) of this. paragraph to “102 percent” is deemed a reference to “150 percent” for any month after the 18th month of continuation coverage described in clause (i) or (ii) of paragraph (2)(A).
 

 Paragraph 3 now had a new “last sentence”, but the cross-reference in § 602(2)(C) did not change. Recall that § 602(2)(C) says that “[t]he payment of any premium (other than any payment referred to in the last sentence of paragraph (3)) shall be considered to be timely if made within 30 days after the date due or within such longer period as applies to or under the plan.” The new “last sentence” of paragraph 3 does not refer directly to any “payment”.
 

 The maze of cross-references and deem-ers in the new last sentence permits employers to raise the premium for continuation coverage from 102% of the average cost of their current workforce to 150% of this cost for ex-employees who are entitled to disability benefits under titles II or XVI of the Social Security Act. “[A]n individual described in the-last sentence of paragraph (2)(A)” is one who has been found totally disabled and entitled to benefits under that statute. Although most ex-employees are entitled to continuation coverage for a maximum of 18 months, a disabled employee is entitled to coverage for 29 months. The new “last sentence” of paragraph 3 permits the employer to raise the charge to these employees, who have higher than average costs of medical care, during months 19 through 29 of continuation coverage. But this affects the amount to be paid, not when to pay, which renders the cross-reference in § ,602(2)(C) nonsensi-. cal, unless understood to mean that during months 19 through 29 paying even a single day late permits the employer to yank the disabled person’s insurance. That, would be an odd thing to attribute to Congress, even granting that the statute is the product of scissors, tape, and handwritten inter-lineations by Members rushing to make their planes. It is, however, what Herr-mann says the statute means. Thousands of disabled persons will lose their benefits, but she will become eligible.
 

 When it enacted § 6703(b), Congress was not done tinkering with § 602(3). Section 7862(c)(4)(A), 103 Stat. 2433, provides:
 

 The last sentence of section 602(3) of ERISA is amended to read as follows: “In no event may the plan require the payment of any premium before the day which is 45 days after the day on which the qualified beneficiary made the initial election for continuation coverage.”
 

 Combine this amendment with the text of § 602(3) as amended by § 6703(b) — including the new last sentence — and you get:
 

 The plan may require payment of a premium for any period of continuation coverage, except that such premium—
 

 (A) shall not exceed 102 percent of the applicable premium for such period, and
 

 (B) may, at the election of the payor, be made in monthly installments.
 

 If an election is made after the qualifying event, the plan shall permit payment for continuation coverage during the period preceding the election to be made within 45 days of the date of the election. In no event may the plan require the payment of any premium before the day which is 45 days after the day on which the qualified beneficiary made the initial election for continuation coverage.
 

 
 *982
 

 That
 
 is bizarre. It would defeat Herr-mann’s claim, for the “last sentence” of § 602(3) would again refer to the initial 45-day period, and § 602(2)(C) would prevent the tacking of the 45 and 30 day periods for payment. But it is hardly likely that by § 7862(c)(4)(A) Congress repealed the new last sentence it had added in § 6703(b). The only way to harmonize the two midnight amendments of 1989 is to assume that § 7862(c)(4)(A) is the “first” amendment to paragraph 3 (alternatively that § 7862(c)(4)(A) really amended what had become, by virtue of § 6703(b), the penultimate sentence of paragraph 3). Understanding the 1989 amendments in this way produces this as the “real” paragraph 3:
 

 The plan may require payment of a premium for any period of continuation coverage, except that such premium—
 

 (A) shall not exceed 102 percent of the applicable premium for such period, and
 

 (B) may, at the election of the payor, be made in monthly installments.
 

 In no event may the plan require the payment of any premium before the day which is 45 days after the day on which the qualified beneficiary made the initial election for continuation coverage. In the case of an individual described in the last sentence of paragraph (2)(A), any reference in subparagraph (A) of this paragraph to “102 percent” is deemed a reference to “150 percent” for any month after the 18th month of continuation coverage described in clause (i) or (ii) of paragraph (2)(A).
 

 Herrmann contends that this version of paragraph 3, coupled with the “plain meaning” of the cross-reference in § 602(2)(C), requires decision in her favor.
 

 Statutes have meanings, sometimes even “plain” ones, but these do not spring directly from the page. Words are arbitrary signs, having meaning only to the extent writers and readers share an understanding. A -mark such as t has a meaning without language, but “up” must be decoded according to rules and cultural norms. Language in general, and legislation in particular, is a social enterprise to which both speakers and listeners contribute, drawing on background understandings and the structure and circumstances of the utterance. Slicing a statute into phrases while ignoring their contexts — the surrounding words, the setting of the enactment, the function a phrase serves in the statutory structure — is a formula for disaster.
 

 Judges who doubt that legislative history is a reliable guide to statutory meaning and question the wisdom of imputing intents to collective bodies do not believe that the alternative is “plain meaning,” as if the dangers of one method of interpretation were an excuse for intellectual folly. The concern “is political rather than epistemological or hermeneutic. [Textualists] are worried that the gauntlet that the Constitution requires bills to run before they become law will be bypassed if judges give heed not just to the enactment itself but to what individual members of Congress said about it, perhaps in a deliberate attempt to influence judicial interpretation.”
 
 Central States Pension Fund v. Lady Baltimore Foods, Inc.,
 
 960 F.2d 1339, 1346 (7th Cir. 1992). See also
 
 In re Sinclair,
 
 870 F.2d 1340 (7th Cir.1989);
 
 Continental Can Co. v. Chicago Truck Drivers Pension Fund,
 
 916 F.2d 1154 (7th Cir.1990). Focusing on the text itself also cuts down the amount of judicial discretion, for judges free to bend law to “intents” that are invented more than they are discovered become the real authors of the rule.
 

 A phrase such as “[t]he payment of any premium (other than any payment referred to in the last sentence of paragraph (3))” is “plain” only when viewed in isolation. Its meaning would be plain if there were only one possible candidate for “the last sentence of paragraph (3)”. Yet the United States Code has thousands of “paragraph (3)”s. Context, and not plain language, implies that the reference is to § 602(3), and not any old paragraph 3. Narrowing the reference in this way leaves three candidates: the last sentence of paragraph 3 in 1986, when Congress added § 602 to ERISA; the new last sentence inserted by § 6703(b) of the Omnibus Budget Reconciliation Act of 1989; and the replacement for the last sentence called for by
 
 *983
 
 § 7862(c)(4)(A) of that statute. Even though the first has been repealed, it is possible that § 602(2)(C) points to the language at the moment of its enactment rather than to substitutes. See
 
 Sutherland on Statutory Construction
 
 § 51.08.
 

 Any reference may be absolute or relative. An absolute reference, sometimes called a specific reference, points to the text present at the time the law was enacted and maintains its force even if that text is repealed. Few cross-references take that form, however. Writing a cross-reference rather than repeating the text to be incorporated is useful precisely because the target may be amended. A pointer permits the effect of a change in one section to propagate to other, related, sections without rewriting all of those related sections. Section 602(2)(C) sounds like a relative reference, but this still does not answer the question what to do with garbled amendments to the section being referred to.
 

 Congress simultaneously replaced the last sentence of paragraph 3 and added a new last sentence. The pair of amendments is best read, we think, to produce the text in the final block quotation above. But it does not follow that the reference in § 602(2)(C) still points to the new last sentence of this reconstructed statute. We came to this version rather than the one preceding it because treating § 7862(c)(4)(A) literally would be preposterous — it would repeal § 6703(b) and leave § 602(3) with two slightly different sentences addressing the 45 days to pay the initial premium. The 45-day sentence in § 7862(c)(4)(A) gets to be the penultimate sentence of § 602(3) only because we deny literal force to the reference in § 7862(c)(4)(A) to “last sentence.” Having massaged § 7862(c)(4)(A) and § 602(3) to avoid making fools of Congress (and ourselves!), we have to read the reference in § 602(2)(C) as pointing to what is now the penultimate sentence of paragraph 3.
 

 This is no departure from textualism; rather it is a recognition that the Omnibus Budget Reconciliation Act of 1989 has produced a series of texts that cannot coexist. Condemned by contradictory enactments to dishonor some bit of text, judges must do the least damage they can. The “least worst” outcome is to treat the reference in § 602(2)(C) as tracking its original subject matter, the time for the initial payment. Congress moved that rule by one sentence, and we reconstruct the legislature’s attempt to point to that rule. All of this follows from
 
 enacted
 
 texts, not from legislative history or efforts to read the minds of legislators.
 

 Modern statutes are complex enterprises, with many of the characteristics of living organisms. Amendments reflect changing perceptions of the public good, or a changing balance of political power. Every new section or sentence in a text riddled with cross-references poses a risk that one of the references will point to thin air, or to a destination out of synch with the referring provision. Political, judicial, and private actors alike need a simple, reliable way to unravel these mistakes. The best approach, we believe, is the one we have used here: treat the referring clause as continuing to point to its original target, even if that target moves or acquires a new number. This follows the logic behind the principle that new section numbers or minor changes in phraseology during the re-codification of a title of the United States Code do not alter its meaning, e.g.,
 
 Newman-Green, Inc. v. Alfonzo-Larrain,
 
 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989);
 
 Fourco Glass Co. v. Transmirra Products Corp.,
 
 353 U.S. 222, 227, 77 S.Ct. 787, 790-91, 1 L.Ed.2d 786 (1957).
 

 One more detail and we are done. Herrmann observes that the 45-day limit does not appear in the “summary plan description” that Cencom distributed to its employees. 29 U.S.C. § 1022. This, she submits, makes the requirement unenforceable. Although a summary plan description should include matters that affect coverage, 29 C.F.R. § 2520.102-3, and prevails over the plan itself in the event of a conflict,
 
 Senkier v. Hartford Life & Accident Insurance Co.,
 
 948 F.2d 1050 (7th Cir. 1991), no document can include every detail and remain a summary. Just how much
 
 *984
 
 time an employee who is fired (but not for gross misconduct) and elects continuation coverage has to pay the first premium affects only a few persons. Larding the summary with minutiae would defeat that document’s function: to provide a capsule guide in simple language for employees.
 
 Kolentus v. Avco Corp.,
 
 798 F.2d 949, 958 (7th Cir.1986). What happens following a series of contingencies is best explained when they come to pass — as Cencom explained the time limit to Herrmann after she elected continuation coverage. The limit was in the plan itself, and Herrmann could have looked it up while she was an employee in the event she wondered about such things.
 

 Affirmed.
 

 †
 

 Section 604(1), 29 U.S.C. § 1164(1), defines "applicable premium” to mean "the cost to the plan for such period of the coverage for similarly situated beneficiaries with respect to whom a qualifying event has not occurred". This means that the ex-employee may be required to pay the average cost of medical benefits for current employees, plus a
 
 2%
 
 administrative charge, but no extra premium to reflect special medical problems.