**In re Joyce May BLACK; A/K/A Joyce Black; D/B/A Joyce Black Trucking Company.**

**Bankruptcy No. 97–10453.**

United States Bankruptcy Court, M.D. Louisiana.

Oct. 15, 1998.

Arthur A. Vingiello, Baton Rouge, LA, for Debtor.

Roy Maughan, Jr., Baton Rouge, LA, for J.D. Trucking Company.

Martin A. Schott, Baton Rouge, LA, trustee.

### RULING

LOUIS M. PHILLIPS, Bankruptcy Judge.

Now before the Court is the objection of J.D.'s Trucking Company ("J.D.'s") to the claim of exemption, pursuant to La.Rev.Stat. Ann. § 13:3881A(2)(d) (West 1991),[1] of Joyce May Black, a/k/a Joyce Black, d/b/a Joyce Black Trucking Company (the "Debtor"), regarding a 1988 International 9379 Centionale Truck (the "Truck").

This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) (West 1993). Pursuant to 28 U.S.C. § 157(b)(2)(A) (West 1993), this is a proceeding over which the court has authority to issue a final order.

Resolution of J.D.'s objection requires that this court decide two issues, both controlled by the Louisiana property exemption statute, R.S. § 13:3881A(2)(d). Before moving on, we quote the relevant portion of the statute, to better frame our introductory outline.

**Section 3881. General exemptions from seizure**

A. The following income or property of a debtor is exempt from seizure under any writ, mandate, or process whatsoever:
* * *
(2) That property necessary to the exercise of a trade, calling, or profession by which he earns his livelihood, which shall be limited to the following:
* * *
(d) One pickup truck with a gross weight of less than three tons, or one motor vehicle, which does not possess any of the characteristics of a luxury automobile as defined under R.S. 39:365(B) which also shall not be a vehicle used solely for transportation to and from the place at which the debtor earns his livelihood.

La.Rev.Stat. Ann. § 13:3881A(2)(d) (West 1991 & Supp.1998).

The first issue raised is whether or not this exemption is available to a debtor who does not personally use the vehicle, but who leases the vehicle to another person or entity and through the vehicle lease derives her sole (as best we can tell) source of income? For reasons set forth below the court decides that R.S. § 13:3881A(2)(d) does not mandate personal use, and that the debtor's claim of exemption would not on this ground be barred.

The second issue, one not raised by the parties, but that must be dealt with by this Court, is (at least to us) a hard one, made harder by the fact that it has not been addressed, within exemption analysis, by any court before us. In 1986 R.S. § 39:365(b) was repealed. There is now no R.S. § 39:365(B), and no statute offering, by way of replacement, a definition of "luxury vehicle." This provision instructed that a luxury vehicle was "one which possesses one or more of the following characteristics: (1) A wheelbase over 121 inches in length; (2) A V8 engine with a displacement over 360 cubic inches; and (3) A total weight over 4500 pounds." La.Rev.Stat. Ann. § 39:365(B) (West 1991), *repealed by,* Act 1986, No. 532, § 2. Therefore, the issue is (because the dump truck at issue does have characteristics of a "luxury vehicle" as such was defined in R.S. § 39:365(B)) did the reference in R.S. § 13:3881A(2)(d) to the luxury vehicle definition of R.S. § 39:365B survive the repeal of the latter statute. As mentioned, if it did, the facts establish that the Debtor's vehicle is a luxury vehicle and therefore cannot be exempted by the debtors as a tool of the debtor's trade. As will be shown, the court concludes that, notwithstanding the repeal of R.S. § 39:365B, Louisiana law mandates that we apply the former statute. Because the stipulated wheelbase measurement of the dump truck exceeds the allowance of that statute, we deny the Debtor's exemption.

### FINDINGS OF FACT

The Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code. In Schedule "C" of her petition, the Debtor listed the Truck, valued in Schedule "B" at $9,500.00, as being exempt, pursuant to R.S. § 13:3881. J.D.'s timely filed a proof of claim asserting an unsecured claim in the amount of $12,628.34, and as well, on April

---

1. Louisiana Revised Statutes will hereafter be referred to by "R.S. §."

18, 1997, filed a timely objection to the Debtor's claim of exemption in the Truck.

In its objection, J.D.'s alleges that at the 341(a) Meeting of Creditors the Debtor testified to the following: that the Truck is a long-haul truck under lease to Bennett Motor Express; that her boyfriend, George King, is the designated operator of the Truck; that she is paid a percentage of the freight transportation costs for the items transported by the Truck pursuant to the contract with Bennett Motor Express; that she does not drive the Truck personally; that she does not know how to drive the Truck; that she has never personally driven the Truck; that she does not have the appropriate driver's license or certifications to operate the Truck; and that the Truck has always been driven by George King.

In particular, J.D.'s contends that the Truck is not property used by the Debtor which is necessary to the exercise of her trade, calling or profession; that the Truck is of considerable value and is income-producing and that the Debtor has continued to collect the post-petition rents earned by the Truck, notwithstanding that these earnings constitute property of the estate; that the Debtor should be required to surrender the Truck to the Chapter 7 trustee or pay to the estate the fair market value of the Truck; and that, because the Truck is non-exempt property, the Debtor should be required to account for all post-petition rents earned by the Truck.

The Debtor responds that the Truck is exempt pursuant to R.S. § 13:3881A(2)(d) because the debtor operates a trucking business as her sole means of support. The debtor admits that the property in question is not driven by the debtor, but submits that it is absolutely necessary to the exercise of her trade. The debtor finds no requirement under R.S. § 13:3881A(2)(d) that the vehicle described therein literally be driven by the debtor.

The parties stipulate that the wheelbase size of the dump truck is 250 inches.

## CONCLUSIONS OF LAW AND DISCUSSION

I. *We look to Louisiana Exemption Law*

(a) *Applicability of Louisiana State Exemption Law*

Although 11 U.S.C. § 541 (West 1993 & Supp.1998)[2] of the Code defines property of the estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case," § 522 of the Code permits a debtor to exempt property from the bankruptcy estate by claiming certain exemptions authorized by that provision. Section 522(b)[3] provides the debtor with a choice between two exemption schemes, and the debtor may choose the federal exemptions set forth in subsection (d), unless the applicable state law specifically does not so authorize.

■■■ A state may "opt out" of the federal exemptions available to the debtor under § 522(d) and limit the debtor's right to claim the federal exemptions as an alternative to those provided under state law. Pursuant to § 522(b)(2)(A), Louisiana has chosen to "opt out" of the federal exemptions established by the Code in § 522, and Louisiana debtors, such as the Debtor in this case, are limited to choosing exemptions available under Louisiana state law only.[4]

---

**2.** 11 U.S.C. sections will hereinafter be referred to by " §."

**3.** Section 522(b) of the Code provides in pertinent part as follows:

(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in either paragraph (1) or, in the alternative, paragraph (2) of this subsection.... Such property is—
 (1) property that is specified under subsection (d) of this section, unless the State law that is applicable to the debtor under para-

graph (2)(A) of this subsection specifically does not so authorize; or, in the alternative, (2)(A) any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180-day period than in any other place. * * *
11 U.S.C. § 522(b)(2)(A) (West 1993).

**4.** See R.S. § 13:3881(B)(1), which provides:

**614**

(b) *The Louisiana Exemption Statute*

The Debtor claims the exemption of the Truck pursuant to R.S. § 13:3881A(d)(2), which provides in pertinent part:

**Section 3881. General exemptions from seizure**

A. The following income or property of a debtor is exempt from seizure under any writ, mandate, or process whatsoever:

* * *

(2) That property necessary to the exercise of a trade, calling, or profession by which he earns his livelihood, which shall be limited to the following:

* * *

(d) One pickup truck with a gross weight of less than three tons, or one motor vehicle, which does not possess any of the characteristics of a luxury automobile as defined under R.S. 39:365(B) which also shall not be a vehicle used solely for transportation to and from the place at which the debtor earns his livelihood.

La.Rev.Stat. Ann. § 13:3881A(2)(d) (West 1991 & Supp.1998).

The characteristics of a "luxury automobile" were, until 1986, defined in R.S. § 39:365(B) as:

one which possesses one or more of the following characteristics:

(1) A wheelbase over 121 inches in length;

(2) A V8 engine with a displacement over 360 cubic inches; and

(3) A total weight over 4500 pounds.

La.Rev.Stat. Ann. § 39:365(B) (West 1991), *repealed by*, Act 1986, No. 532, § 2.

(c) *Rules for Interpretation of Exemption Statutes*

■ Louisiana case law clearly holds that the underlying purpose of § 13:3881 is to provide for the subsistence, welfare, and "fresh start" of the debtor, to the end that his or her family will not be destitute and so

that the debtor will not become a charge on the state. *Ward v. Turner*, 150 B.R. 378 (E.D.La.1993), *opinion after remand*, 176 B.R. 424 (E.D.La.1994), *appeal dismissed by Matter of Ward*, 66 F.3d 322 (5th Cir.1995) (TABLE, 66 F.3d 322, No. 95–30089) (5th Cir.1995); *In re Hendrick*, 45 B.R. 965 (Bankr.M.D.La.1985); *In re Brown*, 189 B.R. 653, 660 (Bankr.M.D.La.1995). Moreover, in construing section R.S. § 13:3881, and its predecessor, Article 644 of the Louisiana Code of Practice of 1870, the intention of the lawmakers must be carried out and given a broad and liberal interpretation conducive to the purpose of exemption, to the end that the obvious purpose of the statute not be frustrated. *Young v. Geter*, 185 La. 709, 170 So. 240 (1936), answers to certified questions conformed to 170 So. 410, 412 (La.Ct.App. 1936); *Laurencic v. Jones*, 180 So.2d 803 (La.App.4th Cir.1965); *Mounger v. Ferrell*, 11 So.2d 56 (La.App.2d Cir.1942); *In re Brown*, 189 B.R. 653, 660 (Bankr.M.D.La. 1995). Therefore, whenever a claim to exemption under § 13:3881 can be brought within the purpose and intent of § 13:3881 by a fair and reasonable interpretation, the exemption will be allowed. *Young v. Geter*, 185 La. 709, 170 So. 240; *In re Brown*, 189 B.R. 653, 660 (Bankr.M.D.La.1995).

■ Louisiana's liberal construction of exemption statutes is not unlimited, however, because exemption statutes, being in derogation of the general rule of non-exemption, must be strictly construed, but not so as to destroy their purpose. *A. Wilbert's Sons Lumber & Shingle Co. v. Ricard*, 167 La. 416, 119 So. 411 (1928); *In re Brown*, 189 B.R. 653, 661 (Bankr.M.D.La.1995). Moreover, exemption laws should be construed as written, without adding to them because they are public policy laws, or restricting their application as in derogation of common right. *Rynella Mill & Mercantile Co. v. Segura*, 128 La. 643, 55 So. 2 (1911); *In re Brown*, 189 B.R. 653, 660 (Bankr.M.D.La.1995).

In cases instituted under the provisions of Title 11 of the United States Code, entitled 'Bankruptcy', there shall be exempt from the property of the estate of an individual debtor only that property and income which is exempt under the laws of the state of Louisiana and under federal laws other than Subsection (d) of Section 522 of said Title 11 of the United States Code.

La.R.S. § 13:3881(B)(1) (West 1991 & Supp. 1998).

## II. Exemption For Non–Personal Use

J.D.'s principal basis for objection is that the debtor does not personally drive the vehicle in question, but, instead leases the vehicle to another entity who pays the debtor for such use. In support of this proposition, J.D.'s directs our attention to an opinion, *In re Hanks*, 11 B.R. 706 (1977), authored by Chief Judge Scott in the United States District Court for the Western District of Louisiana. While we find the opinion instructive, we do not find it to stand for the premise relied upon by J.D.'s. We are further persuaded by a close reading of R.S. § 13:3881 that, based on the express requirement of personal use in other portions of that statute, grafting a "personal use" requirement onto R.S. § 13:3881A(2)(d) would be unwarranted judicial legislation.

### (a) No Legislative Indication of Personal Use Restriction

 While several provisions of R.S. § 13:3881A[5] require use by a specific person or persons, the "tools of trade" subsection does not. A review of R.S. § 13:3881 indicates to our satisfaction that the Louisiana Legislature will require personal use where they consider it to be desirable. A wedding ring, for example, worn currently by a daughter, even though owned by a bankrupt mother, would not be exempt property pursuant to R.S. § 13:3881A(5). Likewise, the personal household items exception found in R.S. § 13:3881A(4)(a) must be used by the debtor or his family, as is illustrated by *In re Mmahat*, 110 B.R. 236 (Bankr.E.D.La.1990).

The debtors in *Mmahat* sought to exempt, pursuant to R.S. § 13:3881A(4)(a), several bedrooms worth of furniture, clearly more furniture than could be used by their family. Further, the debtors desired to exempt certain furniture which could be characterized as "living room furniture" but was not kept in the living room. The debtors asserted that the exemption should be based on the type of furniture ("bedroom," "living room") and not where the furniture was located. *Id.* at 242.

In applying the plain meaning of the exemption statute, as further refined by Webster's, the Court noted that the household exemption required use of the property to be exempted by the debtor or a member of his family. The court, therefore, refused to exempt the articles of bedroom furniture which were kept in a spare bedroom because they were not used by the debtors or members of their family. The court allowed the exemption of living room furniture which was kept in other locations of the house, but used by the family, based upon this same logic. *Id.* at 242.

We find the inclusion of "use required" language in certain portions of R.S. § 13:3881, and its exclusion in R.S. § 13:3881A(2)(d), persuasive evidence that the Louisiana Legislature did not intend to require personal use of debtors seeking to use the "tools of trade" exemption.

### (b) Louisiana Cases Regarding Personal Use of "Tools of Trade"

 While we were unable to find a Louisiana Supreme Court case entirely on point, we were able to find several cases which were instructive. It is clear that a corporation or partnership is ineligible to claim the "tools of trade" exemption. *Ringham v. Computerage of New Orleans, Inc.*,

---

**5. Section 3881. General exemptions from seizure**

A. The following income or property of a debtor is exempt from seizure under any writ, mandate, or process whatsoever:

\* \* \*

(4)(a) The clothing, bedding, linen, chinaware, nonsterling silverware, glassware, living room, dining room, and bedroom furniture, cooking stove, heating and cooling equipment, one non-commercial sewing machine, equipment for required therapy, kitchen utensils, pressing irons, washers, dryers, refrigerators, deep freezers, electric or otherwise, used *by him or a member of his family;*

\* \* \*

(d) The musical instruments played or practiced on *by him or a member of his family;* and

(e) The poultry, fowl, and one cow kept *by him for the use of his family;*

(5) Any wedding rings or engagement rings *worn by either spouse,* provided the value of the ring does not exceed five thousand dollars. La.Rev.Stat. Ann. § 13:3881A(4)(a), (d), (e), (5), (emphasis added) (West 1991 & Supp.1998).

539 So.2d 864 (La.App.4th Cir.1989) (corporation not "natural person" eligible to claim exemption), *Boston Belting Co. v. Ivens,* 28 La.Ann. 695 (1876) (Louisiana exemption statute cannot be construed to protect manufacturing corporation); *Mounger v. Ferrell,* 11 So.2d 56 (La.App.1942) (partnership property not exempt from seizure and sale). It also seems clear that "tools" may be exempted even if the debtor requires help in the use of the tool. *In re Hanks,* 11 B.R. 706 (W.D.La.1977), *Lafourche Ice & Shrimp Co. v. Gilbeau,* 185 So. 310 (La.App.1st Cir.1938) (fisherman could exempt boat even if use of the boat required both he and his son), *Prather v. Bobo,* 15 La.Ann. 524 (1860) (printing press exempt even though its use required debtor and two assistants).

The closest case that could be found regarding non-use of purportedly exempt collateral is *In Re Mmahat,* 110 B.R. 236 (Bankr.E.D.La.1990). Turning once more to that case, we find that the debtors also sought to exempt all of the furniture and equipment in both their law office and their home office. The court found that the tools of trade exemption would be granted if the loss of such implements would result in the deprivation of the debtors' trade or profession. From this rule, the denial of the home office and study were easily made based on lack of necessity. As to the law office, the court allowed the exemption for *two desks, word processors, and other furniture used by the debtor and his secretary.* (emphasis added) *Id.* at 243. Thus, the *Mmahat* court allowed the exemption for a desk and office equipment owned by the debtor and used by his employee. *Id.* Although it is not certain from the facts as to whether the debtor ever used the secretary's desk and word processor, knowing attorneys as we do, we easily infer the negative.

As mentioned, J.D.'s points to *In re Hanks,* 11 B.R. 706 (1977), in support of its argument that personal use of the exempt item is required by the debtor. In that case a debtor sought to exempt a fleet of vehicles that the debtor physically operated in varying proportions with his employees. Of the six vehicles in question, all driven by the debtor and his employees, only one was driven primarily by the debtor. The trustee in that case made the argument that the vehicles in question had to be operated *solely* by the debtor and the Bankruptcy Court agreed, denying the exemption as to all six vehicles. (emphasis added) *Id.* at 710.

■ In interpreting the predecessor to the current version of R.S. § 13:3881, which exempted from seizure "the tools, instruments, and books necessary to the exercise of a trade, calling or profession by which he earns his livelihood, in whole or in part ...," the court found instructive several cases which clearly held that the exemption did not depend on the exclusive use of the tool by the debtor but rather the dependence of the debtor on the use of the tool for any substantial portion of his income. *Lafourche Ice & Shrimp Co. v. Gilbeau,* 185 So. 310 (La. App.1st Cir.1938); *Cox v. Smith,* 275 So.2d 459 (La.App.2nd Cir.1973). "It is axiomatic that the purpose of granting exemptions of the type we are presently dealing with is to allow the bankrupt to continue to function in his livelihood so that he does not become a ward of the State." *In re Hanks,* 11 B.R. at 710.

The court held that the debtor could claim the exemption on an item that he used, even if his use was non-exclusive, but that he could not claim the exemption on numerous items that he allowed others to use so that he could earn rental income. *Id.* Judge Scott's decision carefully sutured a tear in the Louisiana exemption law which would have, at that time, arguably allowed a person or sole proprietorship to retain several vehicles for use in their business.[6] Evidently, however, the decision did not sufficiently close the potential loophole, for the Louisiana legislature closed the remainder the next year by adding a new subsection to R.S. § 13:3881A, which limited the "exercise of trade" exemption for motor vehicles to one.[7]

The prior version of R.S. § 13:3881, then (the version dealt with by the *Hanks* court), is just that, a prior version without limitation

---

6. The 1977 version of R.S. § 13:3881 exempted "tools of trade" with no numerical limit.

7. Acts 1982, No. 670 § 1; Acts 1982, No. 704, § 1.

to the number of trucks (tools in the 1977 parlance). *In re Hanks* is further distinguishable from the case at bar based upon the facts. While it is true that *In re Hanks* could, at first blush, seem to support J.D.'s argument that the debtor in the case at bar cannot claim the exemption for the Truck when she does not personally operate it, this Court finds such an expansive reading of *Hanks* to have more weight than its dictum will support.

*In re Hanks* involved a debtor with multiple sources of incomes, a fleet of vehicles, several employees, and a general exemption statute with no ostensible limit on the number of "tools" (vehicles) exempted. In the present case, we have a debtor with one source of income, exempting one vehicle, with one employee/lessee and a specific statute allowing the exemption of one work vehicle within certain parameters. *Hanks'* pronouncement that a debtor "could even require help in using the tool and have it exempted, but he may not claim an exemption over a fleet of items which he allows others to use so that he may earn income on a percentage basis or gain income from the rental of these items," must be read in the context of the debtor seeking to exempt multiple vehicles. *In re Hanks*, at 710.

This reading of *In re Hanks* is further borne out by the fact that the court's ruling on nonpersonal use, "he may only claim [the exemption] on an item which he uses," is dicta. The record reflects that all of the vehicles for which the debtor sought exemption were used, in varying degrees, by the debtor and his employees. *Id.* at 707. Simply put, the question before the court in *Hanks* was could a **debtor who uses six vehicles,** in varying percentages with his employees, exempt any or all of them. The question was answered (he could keep one), we think, by picking the vehicle that the debtor used the most, or the most exclusively, and allowing the exemption for that one

vehicle. The issue of use, therefore, was not before the court.

Any Court focusing on Judge Scott's decision must not overlook the other component of his reasoning, "[the exemptions] are not intended to provide an incentive to take bankruptcy." The Debtor here is certainly not seeking to exempt a fleet of vehicles, and this Court does not see how allowing her to exempt this Truck would provide an incentive to the filing of bankruptcy. *Id.*

 The debtor in this case is not a corporation or partnership and relies upon her trucking business as a sole source of income. Without this vehicle there is no trucking business. Revised Statute § 13:3881A(2)(d) does not facially require personal use; other provision of R.S. § 13:3881 do so require. The distinction in *Hanks,* as to physically driving the vehicle, or having someone else physically drive the vehicle, must be seen as a combination of dicta and a numerical limiting mechanism for the problematic earlier version of R.S. § 13:3881 which was decidedly not self-limiting.

We conclude that because there is no requirement that the debtor be the person actually using the tool (truck), the claim of exemption will not be defeated for the reason that the truck is leased to a third party.

III. *R.S. § 13:3881A(2)(d) and R.S. § 39:365(B); did the repeal of R.S. § 39:365(B)* [8] *repeal its inclusion by incorporation into 13:3881A(2)(d)?*

We have searched in vain for a Louisiana case dealing with this particular exemption question. We approach it, then, as a question of first impression. If the incorporation did survive, we apply the definition in R.S. 39:365(B) and disallow the exemption. If not, we have no definition and the exemption stands.

---

8. For purposes of this section, a luxury automobile is one which possesses one or more of the following characteristics:
 (1) A wheelbase over 121 inches in length;
 (2) A V8 engine with a displacement over 360 cubic inches; and
 (3) A total weight over 4500 pounds.
 R.S. § 39:365(B) (West 1991); *repealed by,* Act 1986, No. 532, se 2.

To reach our conclusion, we must interpret another Louisiana legislative pronouncement, R.S. § 1:14, which states in pertinent part: "Whenever any reference is made to any portion of the Revised Statutes or to any other law, the reference applies to all amendments thereto hereafter made." Given the existence of R.S. § 1:14, the promulgation of which preceded the repeal of § 39:365(B), we have to decide whether "amendments," as used within the statute, includes "repeals."

### (a) Louisiana Statutory Construction

It is our duty is to determine the "legislative will"[9] underlying R.S. § 1:14. Accordingly, if R.S. § 1:14 is "clear and unambiguous," and not absurd in its application, we shall seek to apply the law as it is written.[10] In determining ambiguity and clarity we are instructed by the Code that words shall be given their "generally prevailing meaning," and that "words of art" and words with "technical" meaning must be given their "technical" meaning if the law involves a technical matter.[11] If a statute's meaning is deemed ambiguous and unclear, legislative will must be determined as "best conforms to the purpose of the laws,"[12] and by "the context in which [the words] occur and the text of the law as a whole."[13] Finally, "laws on the same subject matter must be interpreted in reference to each other."[14]

### (b) The Meaning of "Amendment"

The word "amendment" is defined in Black's Law Dictionary (Black's) as "[t]o change or modify for the better. To alter by modification, deletion, or addition." *Black's Law Dictionary*, 74 (5th Ed.1979).

The verb "change" is defined by Black's as:

Alter, cause to pass from one place to another; exchange; make different in some particular; put one thing in place of another; vacate.

*Id.* at 210.

"Modify" is defined by Black's as:

To alter; to change in incidental or subordinate features; enlarge; extend; amend; limit, reduce. Such alteration or change may be characterized, in quantitative sense, as either an increase or decrease.

*Id.* at 905.

Notwithstanding the mention of "change," which is susceptible to being used interchangeably with the word "vacate," the use of "change" must be seen to fit within "alter," which is also, and preferably, seen as synonymous with "change." For something to be changed "for the better" the thing must continue to exist as itself, recognizable in its changed, modified or altered condition. There can be little argument that the first sentence of the definition of "amendment" is meant to be read in concert with the second, which clearly requires that "change" be read in terms of its synonym "alter."

"Alter" is defined by Black's as:

To make a change in; to modify; to vary in some degree; to change some of the elements or ingredients or details without substituting and entirely new thing or destroying the identity of the thing affected. To change partially. To change in one or more respects, but without destruction of existence or identity of the thing changed; to increase or diminish.

*Id.* at 71.

"Alter" therefore is directly exclusive of "vacate," requiring the continued existence of the thing altered.

The verb "amend," as defined by Black's— "To improve. To change for the better by removing defects or faults." *Id.* at 10—yet again presumes (or requires) the continued existence of the thing amended, and limits "change" to its "to alter" function.

9. *See,* La. Civ.Code Ann. arts. 1 and 2 (West 1995).

10. La. Civ.Code Ann. art. 9 (West 1995).

11. La. Civ.Code Ann. art. 11 (West 1995).

12. La. Civ.Code Ann. art. 10 (West 1995).

13. La. Civ.Code Ann. art. 12 (West 1995).

14. La. Civ.Code Ann. art. 13 (West 1995).

Finally, Black's expressly differentiates "amendment" from "repeal" through its definition of "repeal":

> The abrogation or annulling of a previously existing law by the enactment of a subsequent statute which declares that the former law shall be revoked and abrogated (which is called an "express" repeal), or which contains provisions so contrary to or irreconcilable with those of the earlier law that only one of the two statutes can stand in force (called "implied" repeal). To revoke, to rescind or abrogate by authority.... *Amendment distinguished. "Repeal" of a law means its complete abrogation by the enactment of a subsequent statute, whereas the "amendment" of a statute means the alteration in the law already existing, leaving some part of the original still standing.* ·

*Black's Law Dictionary,* 1167 (5th Ed.1979) (emphasis by underlining added).

According to this definitional source, "amendment" does not include, but in fact is to be differentiated from "repeal."

Our word analysis finds support from other sources. "Amendment" is defined in Webster's II New Riverside University Dictionary (Webster's) as "an improvement[,] a correction[,] a revision[, or] a formal statement of such a revision[.]" *Webster's II New Riverside University Dictionary,* 100 (1984). "Improve" is defined by that work in relevant part as "1. To advance to a better quality or state. 2. To become or get better. 3. To make advantageous additions or changes."

*Id.* at 616.

"Change," in its noun tense, is defined by Webster's as:

> 1.a. The act, process or result from changing. b. Substitution of one thing for another <went to France for a *change* of scene>. 2. Transition from one state or phase to another <the *change* of seasons>. 3. Something different: VARIETY <came home early for a *change*> ....

*Id.* at 248. "Change," in its verb tense, is further defined by Webster's as:

> 1.a. To make different: ALTER. b. To give a totally different form or appearance

to: TRANSFORM .... 3. To exchange for or replace by another, usu[ally] of the same kind or class <*change* one's name>. 4. To lay aside, leave, or abandon for another: SWITCH <*change* planes> <*change* procedures> ....

*Id.*

The noun "correction" is defined in Webster's "1. The act or process of correcting. 2. Something substituted for a mistake <made *corrections* in the manuscript> .... 4. An amount of quantity added or subtracted to correct...." *Id.* at 314. The verb "correct" is defined as "1.a. To remove the errors from. b. To indicate or mark the errors in.... 3. To remove, remedy, or counteract (e.g., a malfunction)...." *Id.*

Finally, "revision" is defined in Webster's as "1. The act of revising. 2. A revised version." Revise is defined as "1. To prepare a newly edited version of (a text). 2. To change: modify <*revise* a previous opinion> ...." *Id.* at 1006.

■■■ As we see from Webster's, "amendment" encompasses the "change" which is synonymous with "alter," again requiring the · continued existence of the thing amended.

"Repeal," on the other hand, is defined by Webster's as "To revoke or rescind, esp. by an official or formal act." "Repeal" therefore effectuates the end or non-existence of the thing repealed.

The terms are exclusive, one ("amendment") requiring that the thing (amended) continue to exist and one (repeal) requiring that the thing (repealed) cease to exist. Therefore, we read the word "amendment" in § 1:14 to exclude repeals (of those statutes referred to by other statutes).

To round out our analysis, we analyze other of the language within § 1:14, recognizing the need to address the context of the word "amendment."

*(c) The Context of "Amendment" Within the Statute; The Meaning of "Applies to"*

Examining the context of "amendment," as used in R.S. § 1:14, we turn to the phrase "applies to" (recall that the reference "ap-

plies to all amendments thereto ...")."Apply" is defined, in pertinent part, by *Black's*, as "[t]o put, use, or refer, as suitable or relative; to coordinate language with a particular subject-matter; as to apply the words of a statute to a particular state of facts." *Black's Law Dictionary*, 91 (5th Ed.1979). "Apply" is defined, in pertinent part, by Webster's II New Riverside University Dictionary as "[t]o put to or adapt for a special use" and "[t]o be pertinent or relevant." *Webster's II New Riverside University Dictionary*, 119 (1984) "Adapt" is defined as "[t]o adjust to a specified use or situation ...." *Id.* at 77. "Use" as a noun is defined as:

> 1.a. The act of using or putting to a purpose ... b. The condition or fact of being used. 2. The manner of using ... 3.a. The permission, privilege, or benefit of using *something* ... b. The power or ability to use *something* ... 4. The need or occasion to use or employ ... 5. The quality of being suitable or adoptable to an end: USEFULNESS. 6. The goal, object, or purpose for which *something* is used....

*Id.* at 1271. (emphasis added).

The applicable definition of "apply" found in *Black's* clearly requires a reference to a "particular subject matter." Is a repealed statute a particular subject matter? We think not. A repealed statute is no subject matter. Likewise, the applicable definition of "apply" found in *Webster's* centers on the concept of "use." "Something" is mentioned several times in the definition of "use." Can a statute use a repealed statute? Is a repealed statute something or is it nothing? We think the answers are "no" and "nothing."

Because "applies to" requires an object (something) to receive such an application, our interpretation of "amendment," that it does not include "repeal," is bolstered. For a statute to apply to an amendment, the amendment must be incorporated into the pre-existing statute, and that statute must continue to exist. Otherwise there is nothing to apply to. We note, also, that had the

Louisiana Legislature intended for a reference in a statute to track or follow a subsequent *repeal* of the referenced statute, the Legislature could have used "is controlled by," "is modified by," or some other like phrase, rather than "applies to." Such phrases as these would allow the amendment to work backward upon the referring statute, rather than requiring that the reference work forward to the amendment. However, given our discussion of the difference between "amendment" and "repeal," the backward working phrases probably would not have resulted in an expansion of the term "amendment," even if the statute were so constructed. "Amendment" would have to be expanded by the addition of "or repeal."

What we get from our analyses is that regardless of whether we are concerned with the generally prevailing meaning of "amendment," or with its technical meaning (as a word of art), "amendment" does not include "repeal." Therefore, as written, § 1:14 requires that the initial reference to § 39:365(B) within § 13:3881(A)(2)(d) stand, unaffected by the repeal of the statute referred to, as the repeal is not an "amendment" to § 39:365(B) to which the reference thereto must apply. We think we have shown that the statute, § 1:14, is unambiguous, once we have obtained the meaning of the words. However, Louisiana law requires us to go further, to determine that giving the words their meaning and using them accordingly does not create absurdity.

We think not. Clearly the legislature had a specific picture of the type of motor vehicles that could not be claimed exempt, and confected, by reference, a very easy and concrete definition. The grafted definition is from the statute which dealt with the limitations upon the purchase, by the state for state use, of "luxury vehicles." The repeal of § 39:365(B) reflected a redirection in the legislative thinking concerning the purchase of state automobiles, as the section was replaced by a new group of statutes concerned with containing the preferred means of fleet purchasing.[15]

---

**15.** The statutes, revised, include La. R.S. 39:361–364. There is no longer reference to luxury vehicles.

The impetus for the repeal of the statute in no way implicates the reason for incorporating the definition of luxury vehicles into the exemption statute. The legislature needed a definition, and it still applies. The need to have the referring statute apply to an amendment or alteration of the definition of luxury vehicles, on the other hand, makes sense.[16] If the legislature changes the perspective as to what constitutes "luxury vehicle" for purposes of the incorporated provision, presumably that amendment (designed to make the statute better) should as well be incorporated. To figure out the statutory relationships this way makes sense. Reading § 1:14 as we have does not, upon initial impression, generate absurdity.

There is another level at which our reading of § 1:14 to exclude repeals makes sense (thereby avoiding absurdity). Historically, the method by which the Anglo–American common law tradition interpreted the consequences of incorporation of statutes by reference would have required that statutory incorporation such as that contained within § 12:3881(A)(2)(d) be unaffected by either amendment or repeal, without legislative intercession.[17] Discussion of this interpretative method is meant to offer support to our conclusion that our "generally prevailing meaning" analysis does not create absurdity; as well we mean to convince ourselves that our determination of legislative intent will "best conform to the purpose of the law" at issue (though this support under Louisiana principles of statutory interpretation is unnecessary, it makes us feel better).

*(d) In Light of the Tradition, the Purpose of R.S. § 1:14*

Beyond the fact that R.S. § 1:14 was passed in 1950 as one of the *Revised Stat-*

*utes*, there is no legislative purpose expressed elsewhere. No genesis is listed in a revisioner's note (there is no revisioner's note). No mention of such a statute can be found in any compilation of Louisiana Statutes examined by this court, which include *Martin's Digest of 1816, Moreau's Digest of 1828, Bullard & Curry's Digest of 1842, Pierce, Taylor & King's Digest, U.B. Phillips Revised Statutes of 1855,* the *Revised Statutes of 1870,* and *Dart's General Statutes.* Although the *Revised Statutes of 1950* are, in most part, a compilation of previous Louisiana statutes, it is thought that the General Provisions (R.S. §§ 1–17) were new additions to our law. The only hint of their source is a list of state statutes in R.S. § 2, including statutes from Arizona, California, Kentucky, Louisiana, and Pennsylvania. Of those states, only California had an analogous statute in place prior to 1950.[18]

The California statute closely parallels the language of R.S. § 1:14. Section 12 of the California Business and Professions Code states: "Reference to statutes; amendments and additions[.] Whenever any reference is made to any portion of this code or of any other law of this State, such reference shall apply to all amendments and additions thereto now or hereafter made." We find it likely that § 1:14 was borrowed from this California statute. Why did the legislature deem this necessary? We think it likely that there was a perceived need to carve a middle road between the either/or avenues of statutory construction that had developed according to whether an incorporation of a statute or statutory content was specific or general.

A leading treatise on the subject, *Suther-*

---

**16.** Especially in light of the statutory interpretation lane we will address below.

**17.** We mention the Anglo–American common law tradition only after determining there to be an absence of civilian tradition underlying § 1:14.

**18.** Pennsylvania now has a similar statute:
§ 1937. References to statutes and regulations
(a) A reference in a statute to a statute or to a regulation issued by a public body or public officer includes the statute or regulation with all amendments and supplements thereto and

any new statute or regulation substituted for such statute or regulation, as in force at the time of application of the provision of the statute in which such reference is made, unless the specific language or the context of the reference in the provision clearly includes only the statute or regulation as in force on the effective date of the statute in which such reference *is* made.
(b) The provisions of subsection (a) of this section shall apply to every statute finally enacted on or after July 1, 1971.
1 Pa. Cons.Stat. Ann. § 1937 (West 1995).

**622**

land On Statutory Construction,[19] treats statutes of incorporation as either specific or general, depending on the language of the incorporation (as well as legislative intent).

■ A specific incorporation incorporates the cited statute as it is found at the time of incorporation. Subsequent amendment or repeal of the cited statute has no effect on the citing statute, absent legislative intent to the contrary. A typical example of a specific incorporation is *Overstreet v. Blum*, 227 So.2d 197 (Fla.1969).[20] In that case, a Florida statute incorporated another Florida statute by referring to the title of the statute to be incorporated. The court held that this was sufficient to establish that the incorporation was by reference (synonymous with specific) and that the subsequent amendment of the incorporated statute would not have any effect. *Id.* at 198. The majority of cases that have found an incorporation to be specific hinged their decision on the fact that the incorporation included the title and/or number of the statute to be incorporated. The problem inherent in a specific incorporation is that once incorporated, the reference is frozen, unless the referring statute is specifically amended along with any amendment to the referred-to statute.[21]

■ A general incorporation of statutory content, as distinguished from specific incorporation, is seen to include subsequent amendments repeals. General incorporations reference other statutes (we hesitate to say this) generally. To clarify, we point to *Palm Beach County National Utility Company, Inc. v. Palm Beach County Health Dept.*, 390 So.2d 115 (Fla.App.4th 1980), as an example of this type of reference. In this case, a utility company capped a water well located upon its property that was no longer being used. The company was charged by a local environmental control board of violation of certain rules promulgated pursuant to state statutes, one of which had (before its repeal) required that all such wells be plugged (as opposed to capped).

According to the court (reviewing the conviction of the company for maintaining an abandoned and improperly plugged well), the means by which the supposedly applicable rules had been incorporated into the municipal code was through an incorporation provision that read:

"All rules to date adopted by the Florida Department of Environmental Regulation ... pursuant to (Chapter 381, Florida Statutes) ... are hereby adopted and incorporated by reference as part of this ordinance to the same extent and to the

**19.** *Sutherland On Statutory Construction* § 51.08.

**20.** *See, also, e.g., Grundy County Nat. Bank v. State Property Tax Appeal Bd.*, 297 Ill.App.3d 774, 232 Ill.Dec. 179, 697 N.E.2d 921 (Ill.App.3rd Dist.1998); *Bethel Public Utilities Com'n v. Bethel Stony Hill Associates*, 1992 WL 340483 (Conn.Super.1992); *San Bernardino County Sheriff's Assn. v. Board of Supervisors*, 7 Cal. App.4th 602, 8 Cal.Rptr.2d 658 (Cal.App.4th Dist.1992); *Silva v. Southwest Florida Blood Bank, Inc.*, 601 So.2d 1184 (Fla.1992); *City of Rock Hill v. South Carolina Dept. of Health and Environmental Control*, 302 S.C. 161, 394 S.E.2d 327 (S.C.1990); *State Highway and Transp. Com'r v. Gordon*, 222 Va. 712, 284 S.E.2d 593 (Va.1981); *State v. J.R.M.*, 388 So.2d 1227 (Fla. 1980); *Boynton v. Lenox Square, Inc.*, 232 Ga. 456, 207 S.E.2d 446 (Ga.1974); *Simmons v. State*, 160 Conn. 492, 280 A.2d 351 (Conn.1971); *Union Cemetery v. City of Milwaukee*, 13 Wis.2d 64, 108 N.W.2d 180 (Wis.1961); *Sullivan v. Siegal*, 125 Colo. 544, 245 P.2d 860 (Colo.1952); *Dairy and Consumers Co-op. Ass'n v. Arizona Tax Commission*, 74 Ariz. 35, 243 P.2d 465 (Ariz. 1952); *Palermo v. Stockton Theatres, Inc.*, 32 Cal.2d 53, 195 P.2d 1 (Cal.1948).

**21.** The current trend in distinguishing specific, or reference, incorporations from general incorporations is to use either legislative intent or a "modern presumption" disfavoring non-general (specific) incorporations so as to find that the incorporation is general. A case which illustrates this line of reasoning is *Herrmann v. Cencom Cable Associates, Inc.* 978 F.2d 978 (7th Cir.1992). In *Herrmann*, the Court dealt with a "web of cross-references" written by Congress, scores of which had either been amended, repealed or both. All of the cross-references were, by the language, specific incorporations (most cited the referenced statute by title). *Id.* at 983. The Court found the rather absurd result that a specific incorporation would work on the code as "legislative intent" to treat the incorporation as general. "The best approach, we believe, is the one we have used here: treat the referring clause as continuing to point to its original target, even if that target moves or acquires a new number." *Id.* at 983. The logic may be thinly-veiled bootstrapping, but the result is, perhaps, preferable to having a complete ERISA meltdown.

same effect as if the provisions of each ... rule had been set out in full ..." *Id.* at p. 116.

According to the court, the portions of the Administrative Code which had contained the plugging requirement had, along with other chapters of the Administrative Code, been repealed prior to the charges against the utility company.

Referring to Florida law as embracing the general method of statutory construction, and concluding that the method of incorporation (of an entire section of the Administrative Code promulgated pursuant to a chapter of the Revised Statutes) was general, the court discussed the changes, concluding "[i]f adopted by general reference, the rule is to the contrary of that applied to adoptions by specific reference, and the subsequent repeal of the regulation renders the adoption by reference unenforceable." *Id.* at p. 116.

These are the two methods and consequences of statutory incorporation that have evolved within the doctrinal writing. The specific incorporation doctrine, as has been recognized, contains a major consequential flaw. Once a specific reference is made, it is frozen for all time as initially incorporated, regardless of changes made to the incorporated statute thereafter. Therefore, legislatures are faced with the necessity, if courts follow the doctrinal directive, of amending all referencing statutes upon each amendment of any statute referred to by another, or suffer the existence of a statute and references thereto, each of which possibly is saying something different (all of which appear the same).

To avoid the necessity of re-promulgating the same referencing statutes, over and over, to keep up with amendments to the referred statute, it seems likely that there occurred a legislative lightbulb illumination. Why not promulgate a statute that will allow referencing statutes to keep pace with amendments to referenced areas though the incorporation be specific? Such a legislative act would allow courts to interpret honestly legislative intent (as to whether an incorporation is specific or general) and would keep legislatures from having to reiterate laws previously passed to keep them current.

We think just such a result was contemplated by the California and Pennsylvania statutes mentioned above, and as well, by § 1:14.[22]

We keep in mind, therefore, the prevailing statutory interpretation construct, or backdrop, against which the legislative promulgations were confected. General incorporation of statutory subject matter results in the referencing statute being repealed, or amended by the repeal or amendment, of the referenced statute. The only middle ground possible (if it be a true middle ground) would have been to legislatively provide for a specific incorporation to be affected by the amendment (as opposed to the repeal) of the referenced statute; otherwise (if it was to be affected by the repeal, also), the consequence would have been no different than that involving a general incorporation. We think it more reasonable to conclude that the state legislature modified one of the doctrinal effects of specific incorporation, reserving to the general incorporation doctrine the effect of repeal of the referenced statute.[23]

**22.** See, for another example of a way of doing this, on a case-by-case basis, the decision of ·*Salem and Beverly Water Supply Bd. v. Comm'r of Revenue*, 26 Mass.App.Ct. 74, 523 N.E.2d 473 (Mass.App.Ct.1988). In this case the Court noted that despite the specific reference to the incorporated statute, examination of the language of the referencing statute provided that it would "remain subject to future 'regulations and obligations.'" *Id.* at 77, 78 (citation omitted). The Court inferred from this language that the Massachusetts Legislature intended for the reference to encompass amendments. *Id.* at 78. A specific incorporation which, by its language, adopts amendments acts in part like a general incorporation, in that subsequent amendments to the specific statute incorporated will be followed.

**23.** The Louisiana Civil Code provides, regarding the effect of repeal, as follows:

**Art. 8. Repeal of laws**

Laws are repealed, either entirely or partially, by other laws.

A repeal may be express or implied. It is express when it is literally declared by a subsequent law. It is implied when the new law contains provisions that are contrary to, or irreconcilable with, those of the former law.

The repeal of a repealing law does not revive the first law.

Recall that we are attempting to perform statutory construction. Clearly, under the doctrinal directive that preceded § 1:14, the incorporated statute (La. R.S. 39:365(B)) would be seen to have been specific incorporation (the statute number down to subsection is referred to as the incorporated definition of luxury vehicle). Our reading of § 1:14, which excludes repeals, satisfies precisely the interpretational void existing between the alternative effects of incorporation. A change in the notion of what constitutes a luxury vehicle will be reflected; a repeal of the luxury vehicle provision for a purpose different from that underlying the referencing statute will not eviscerate the exception provision.[24]

*(e) A Louisiana Supreme Court Decision; Probably Not Precedent, But It Certainly Doesn't Hurt*

There is one Louisiana case that discusses the issue of the repeal of a referenced statute (though before the promulgation of § 1:14 and outside the scope of the exemption statutes). In that case, *Delahoussaye v. Board of Trustees of City of New Iberia*, 157 La. 782, 103 So. 152 (La.1925), the Louisiana Supreme Court dealt with the repeal of a legislative act which had been by reference incorporated into another. Act No. 23 of 1914 (Act 1) was a state legislature amendment to the Charter of the City of New Orleans and provided for the right of a certain percentage of citizens to petition the governing boards of the city for parking and/or repaving of streets and sidewalks.

Finding that the powers granted by Act 1 would be beneficial to certain other municipalities, the legislature passed Act No. 31 of 1915 (Act 2) which expressly allowed municipalities (with populations of over 2,500) to incorporate the substance of Act No. 23 of 1914 into their city charters. By referring specifically to Act No. 23 of 1914, the legislature "made the statute designated by it as much a part of Act No. 31 of 1915 as if it had literally incorporated the former in the latter." *Id.* 157 La. at p. 796.

Act 1 was subsequently repealed and the argument was raised that Act 2 fell along with it. To resolve this question the *Delahoussaye* court looked to a contemporary encyclopedia (*Ruling Case Law*) and stated a portion of the general Anglo–American statutory construction rule. "[W]hen a prior Act is incorporated in a subsequent one in terms or by relation, the repeal of the former leaves the latter in force, unless also repealed expressly or by necessary implication."[25] The *Delahoussaye* court adopted this common-law analysis and in its application found that this specific incorporation was unaffected by the repeal of the incorporated statute. *Id.*

The *Delahoussaye* case provides us but little guidance, now that § 1:14 has been promulgated, but it does establish the familiarity of the Louisiana Supreme Court with the Anglo–American statutory interpretation doctrine, and establishes further the court's adherence thereto. *Delahoussaye*, in fact, sets up the doctrinal divide; it is clearly

---

This Article deals with situations different from those dealt with here, though the second sentence could be conceivably stretched to cover this. Frankly, as mentioned, we have not found any civilian underpinning different from that dealt with in this opinion (otherwise, of course, we would have used it).

**24.** Our analysis is, we think, supported by resort to the "what if" perspective. What if the reference was repealed along with § 39:365(B)? Would the statute read as follows?

... or one motor vehicle which does not possess any of the characteristics of a luxury vehicle ... which shall also not be a vehicle used solely for ...

or, would the statute read as follows?

... or one motor vehicle, which shall *also* (why would we keep the also) not be a vehicle used solely for ...

or, would the statute read as follows?

... or one motor vehicle, which shall not be a vehicle used solely for ...

We think re-writing the exemption statute by deeming the repeal of § 39:365(B) as a repeal of the reference to it to be, at easiest, very difficult.

**25.** The *Delahoussaye* court left out the first half of the rule as stated in 25 R.C.L. Statutes § 161, "But [sic] when the adopting statute makes no reference to any particular statute ... but refers to the law generally which governs a particular subject, the reference ... includes not only the law in force at the date of the adopting act but also all subsequent laws on the particular subject referred to, so far at least as they are consistent with the purposes of the adopting act."

25 R.C.L. Statutes § 161.

consistent with the doctrinal directive regarding specific incorporation and thereby suggests adherence to the same regarding general incorporation. *Delahoussaye,* in fact, establishes the common sense need for legislative intervention by means of § 1:14, for the reasons we have discussed (remember, this doctrine is not set forth upon stone tablets obtained from the most impervious of bedrock; rather, it has sufficed as a method *of navigating in waters bereft of the buoys of legislative pronouncement).*

So, we have, we think, gone far enough. The language of § 1:14 is unambiguous and can be interpreted according to generally prevailing meanings. So interpreted, the words fit together, as language, within the context of § 1:14. Regarding the words as we have creates no absurdity, and in fact, makes the best sense. There is no jurisprudential authority requiring this Court to rethink, because the pre-existing espousal is analytically consistent with the decision rendered here (were it not for § 1:14, *Delahoussaye* would still be the law regarding the consequences of both amendment and repeal in instances of specific incorporation. Now it is consistent within the outcome required by our reading of § 1:14 to exclude repeals). A vehicle such as the one at issue possesses at least one of the characteristics of a luxury vehicle as defined under the former La. R.S. 39:365(B), which remains encased within § 13:3881(A)(2)(d) of this state's exemption law, notwithstanding its repeal.

The claim of exemption is denied. A separate Order will issue.